**CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Plaintiff,**

v.

**CONSOLIDATED COAL COMPANY, Defendant.**

**No. S–CIV–76–0114.**

United States District Court, C. D. Illinois, Springfield Division.

July 2, 1981.

David J. Rosso, Pamela B. Strobel, James A. Fletcher, Isham, Lincoln & Beale, Chicago, Ill., for plaintiff.

Rose, Schmidt & Dixon, Pittsburgh, Pa., Stephen A. Milwid, Lord, Bissell & Brook, Chicago, Ill., for defendant.

## ORDER

ACKERMAN, District Judge.

Currently before the Court is a motion for a preliminary injunction, filed by petitioner-defendant Consolidated Coal Company (hereinafter referred to as Consol), to enjoin Central Illinois Public Service Com-

pany (hereinafter referred to as CIPS) from accepting delivery of coal for use at its Coffeen Generating Station (hereinafter Coffeen Station) from any source other than Consol. Concomitantly, Consol seeks an injunction requiring CIPS to accept and pay for coal from Consol's Hillsboro Mine (hereinafter referred to as Hillsboro Mine, or Mine).

The following facts are alleged in the Petition for Preliminary Injunction and find support in the evidence.

### FACTS

In the early 1960's CIPS, which supplies electric power to much of Central Illinois, determined that it would require a new generating station to meet the increasing demand for electric power in that region. After exploring numerous alternatives, CIPS decided to construct a generating station at Coffeen, Illinois. The Coffeen location was chosen because it was located near the center of CIPS' customer load area, because it had a ready source of coal and because it had an available water source to be used for cooling the plant.

The coal reserves available in the Coffeen area were owned by Consol and were known as the Hillsboro reserves. Prior to CIPS' decision to build its generating station at Coffeen, Consol supplied numerous core samples of the coal contained in the Hillsboro reserves to CIPS. CIPS obtained opinions, based upon its own analysis of the core samples, from its engineering consultants and its boiler consultants concerning the desirability of utilizing the Hillsboro reserves. In reliance upon the recommendations of its own consultants, CIPS decided to proceed with its proposed generating station at Coffeen Station.

In early 1962, Consol and CIPS negotiated the contract whereby Consol was to supply CIPS with its entire fuel requirements for the Coffeen Station. In order to save transportation costs, and thereby make the coal available to CIPS at prices well below the market price, the Coffeen Station was designed and constructed as a "mine mouth plant". This meant that once CIPS selected

the location for the Coffeen Station, Consol was obliged to locate its mine in such a manner that the coal would be hoisted from the ground in the area immediately adjacent to Coffeen Station, for convenient and economical delivery to CIPS' stockpile via a conveyor belt. As a result of this design and construction of Consol's mine, the coal produced there was transportable only to the Coffeen Station; the conveyor belt design precluded loading of large quantities of coal into trucks or rail cars for delivery to another user.

To further reduce the cost of the coal to CIPS, the Hillsboro Mine was designed to produce and the Coffeen Station was designed to receive and consume raw, untreated coal, eliminating any need for a costly coal preparation plant. The Coffeen Station was expressly designed for consumption of raw coal and CIPS' boiler consultant, Babcock & Wilcox, determined that the coal in the Hillsboro reserves was of adequate quality to be burned in the boilers installed at Coffeen Station, boilers which were specially designed for precisely that purpose. In fact, the boiler could have been designed for any quality coal but the boiler in question was designed upon the core samples taken from the site. The lack of a preparation plant further tied the Hillsboro Mine to the Coffeen Station, and effectively precluded the sale of most of the Hillsboro production to any user other than the Coffeen Station.

As a result of the efforts outlined above, Consol was able to sell coal from the Hillsboro Mine to CIPS at prices below the market rate and, in fact, the Coffeen Station produced electricity at a cost per unit generally below the costs at CIPS' other generating stations.

In return for taking the steps outlined above to provide cheaper coal to CIPS than was then otherwise available, Consol and CIPS agreed to commit to a long term agreement to sell and purchase coal from the Hillsboro Mine, to ensure that Consol would have an adequate opportunity to recoup its investment in the Mine. This was necessary because the special design of the

Hillsboro Mine to supply the Coffeen Station precluded the sale of the bulk of the Mine's production to any other user.

On March 19, 1962, Consol and CIPS executed the contract by which CIPS was required to purchase the entire fuel requirements of the Coffeen Station from the Hillsboro Mine and Consol was to supply those requirements, based on yearly estimates provided to Consol by CIPS. The term of the contract was fixed at thirty years after the initial operation of the Coffeen Station commenced. Both parties reserved the right to terminate the contract if performance became uneconomical or impractical, but the right of termination was exercisable only upon five years' written notice and further exercisable only after fifteen years from the initial operation of the Coffeen Station. (Article VII)

During negotiation of the contract, CIPS submitted a proposal as follows: "Section 4. The coal to be furnished by Consol hereunder shall have a calorific value of not less than 10,000 BTU per pound, 'as received.' CIPS shall have the right to reject delivery of coal that does not meet this minimum calorific value." Consol claims that because it was impossible to know for certain the quality of the coal the Mine would produce, and because both parties had formed estimates of the coal quality based on core samples, the contract did not contain any guarantee of minimum quality. The contract did estimate that the coal as delivered would average 10,235 BTU's per pound and further provided that should the quality of the coal fall below an average of 10,000 BTU's per pound, Consol would take corrective action to raise the quality above that level. (Article VI). The contract provided that the price paid by CIPS would depend on the actual number of BTU's supplied by Consol, rather than on the number of tons delivered.

After the execution of the contract, CIPS proceeded to construct the Coffeen Station and Consol to build and develop the Hillsboro Mine, in accordance with the agreement between the parties. To date, Consol has invested over $23,000,000.00 in the construction and development of the Mine. CIPS has invested equally significant sums in its Coffeen Station, which began operating on December 20, 1965. Consol supplied coal to the Coffeen Station at a rate of approximately one million tons per year through 1972. The BTU level of the coal provided was below that of the estimate in the contract. Consol claims that at all times it used its best efforts to improve the coal quality. CIPS disputes this claim.

On December 4, 1970, the parties executed an agreement (hereinafter referred to as "the 1970 Contract"), that modified in some respects the 1962 agreement. In the 1970 Contract, CIPS committed to the addition of a second generating unit at the Coffeen Station, to begin operation no later than March 1, 1972. The second unit was to greatly increase the demand for coal at the Coffeen Station, and Consol was to provide the additional coal from the Hillsboro Mine. In order to permit orderly development of the Mine, CIPS gave Consol two years' advance notice that it would require coal to be delivered at a rate of approximately 2.5 million tons per year once the second unit began operating.

The 1970 Contract also increased the price that Consol would be paid for its coal, decreased the estimate of the BTU level of the coal, and maintained the term of the contract, providing for expiration on December 20, 1995, but allowing either party to terminate for reasons of economic hardship or impracticality at any time after December 20, 1980, upon not less than five years' written notice of termination.

Although the contract requires CIPS to obtain the entire fuel supply for the Coffeen Station from the Hillsboro Mine, at various times CIPS has blended small amounts of coal purchased from other sources with the Hillsboro coal without objection from Consol. Consol agreed to reduce its production to about 1.7 million tons on an annual basis to permit CIPS to blend the Hillsboro coal with other coal to achieve higher BTU levels. This necessitated a layoff of numerous Consol employees. Also, Consol has sold small amounts of coal to the

City of Springfield and two other purchasers at times when the production of the Hillsboro Mine had exceeded the requirements of the Coffeen Station. Nevertheless, over the entire history of the Hillsboro Mine and the Coffeen Station, the Station has obtained virtually its entire supply of coal from the Mine, and the Mine has delivered virtually its entire output of coal to the Station, in accordance with the contract.

On September 21, 1976, CIPS filed in this Court a Complaint against Consol for specific performance and damages. CIPS alleged in the Complaint and Amended Complaint that Consol had breached the contract by failing to supply the quantity or quality of coal required by the contract. Consol denies that it has breached the contract, contending that any failure on its part to supply the entire fuel requirements of the Coffeen Station, as required by the contract, has resulted from causes beyond its control, including, *inter alia*, the 1969 Federal Coal Mine Health and Safety Act, and claimed variations and errors in the estimates of coal requirements provided to Consol by CIPS. As to quality, CIPS alleges that the BTU content of coal delivered has not met the contractually required minimums. Consol denies that the contract contains any guaranteed BTU standard, and asserts that what the contract does contain is an estimate of the average BTU content of the Hillsboro Mine reserves, arrived at as a result of analyses by both Consol and CIPS of core samples taken of existing reserves, and additionally Consol's agreement to take reasonable corrective action to increase the BTU content if it falls below a figure stated in the contract. Consol further contends that it has used its best efforts to maintain and increase the productivity of the Hillsboro Mine and to raise the BTU level of the coal delivered. This contention is disputed and a final resolution must necessarily await trial on the merits.

After the lawsuit was initially filed in 1976, it lay dormant for an extended period while the parties attempted to resolve their differences. Consol claims to have made various proposals to CIPS for improving the production from the Hillsboro Mine, but asserts that all such proposals were rejected by CIPS. During approximately the first four years of the litigation, this Court did not move the case expeditiously toward trial on the merits because of explicit representations by the parties that in all probability the matter could be amicably settled.

In discussions between representatives of CIPS and Consol, CIPS contended that it was experiencing technical difficulties in the operation of the boilers, and represented that the problems were caused by the low BTU content of the Hillsboro coal. Consol, on the other hand, claims CIPS' operational problems are primarily due to the sodium content of the coal, a regional characteristic that was known to its consultants from the inception of its Coffeen project and to inadequate boiler design, and not due to the BTU content of the Hillsboro coal. Evidence in the record substantiates Consol's claim that operational problems may well be related to factors other than BTU content. In handwritten notes by a CIPS executive, made contemporaneously with the construction of the Coffeen Station, a notation appears as follows: "Must be able to burn this coal—without excess slagging. Note—high sulfur 4.5 to 5.0 and total alkalies 0.25 to 0.30% $NA_2O$." (Defendant's ex. 12). In deposition testimony, Marshall S. Luthringer, President of CIPS at the time of the construction of the Coffeen Station, indicated that high chlorite content as well as high sulphur content of the coal were factors which could indicate possible potential problems for the boilers. (Defendant's ex. 30).

On February 11, 1980, CIPS requested adequate assurance of performance pursuant to Section 2–609 of the Uniform Commercial Code, specifically seeking assurance that the BTU level of the coal from the Hillsboro Mine would meet or exceed the "minimum heat content" specified in the contract.

On February 21, 1980, Consol responded to CIPS' request and claimed that the contract contains no guarantee that the coal

would meet any specified BTU level, but requires only that Consol take corrective action to raise the BTU level should it fall below 9500 BTU's per pound. Consol argued to CIPS that it had always used its best efforts to keep the coal above 9500 BTU's per pound, and would continue to do so in the future, in accordance with its contractual obligations. From 1975 through October, 1980, the yearly average BTU per pound of coal delivered to CIPS was 9381, 9329, 9387, 9323, 9421 and 9437 respectively. Consol strenuously claims that compliance with the Mine Health and Safety Act (hereinafter referred to as MHSA) passed in 1969, and the regulations promulgated thereunder, has caused a reduction in the BTU content of the Hillsboro coal. CIPS' own expert consultants, John T. Boyd Company, conducted an analysis of how the MHSA impacted the BTU content of Hillsboro coal. It concluded that as a result of compliance with MHSA the BTU content of Hillsboro coal was reduced 445 BTU's per pound. If the BTU loss resulting from the MHSA is added to the yearly average figures outlined above, Hillsboro coal has substantially exceeded 9500 BTU's per pound, the purported "minimum" contract requirement. Consol's position is that the MHSA constitutes a "Force Majeure" as defined in Article IX of the Coal Supply Agreement and any contractual obligation Consol has with respect to BTU content is suspended "to the extent made necessary by such force majeure during its continuance." CIPS, on the other hand, contends that force majeure can be used defensively, i. e. to excuse performance in the event of certain occurrences, but cannot be asserted by a party to force the other party to accept nonconforming goods.

By letter dated August 26, 1980, CIPS reiterated its position that Consol was in breach of the contract, stated that Consol's assurances of performance were inadequate, and informed Consol that it would begin investigating the possibility of finding a different long term supplier of fuel for the Coffeen Station.

On September 26, 1980, Consol filed its amended counterclaim, seeking damages for, *inter alia*, CIPS' refusal to accept coal from the Hillsboro Mine and CIPS' anticipatory repudiation of the contract as reflected in CIPS' announcement that it would seek an alternative supplier of coal for the Coffeen Station.

On February 23, 1981, in accordance with Article VI of the 1970 Contract, Consol gave notice that it would terminate the contract effective March 1, 1986. Its stated reason was that due to the wide fluctuations in CIPS' estimate of its coal needs, CIPS' refusals to accept coal, and CIPS' threats to find an alternative supplier of fuel for the Coffeen Station, Consol has been unable to properly plan for and effectuate the development of the Hillsboro Mine. Consequently, the operation of the Mine has become uneconomical and impractical. Its stated reason was that

In April, 1981, the membership of the United Mine Workers Union (UMW) began a strike which caused the Hillsboro Mine to cease production of coal. During the strike, Consol claims to have expended large amounts, approximately $3,000,000.00, to rebuild its skip hoist and certain conveyor belts, to make other capital improvements and to keep the Mine ready for immediate and safe resumption of coal production upon settlement of the strike. During this two-month period, CIPS did not warn that it was negotiating another coal contract or that it intended to terminate the contract and refuse to accept coal on one day's notice.

On June 4, 1981, after the UMW leadership had announced agreement on a new contract and two days before the union membership ratified the agreement and agreed to return to work, CIPS purported to unilaterally terminate the contract between Consol and CIPS and advise Consol that it would no longer accept coal from the Hillsboro Mine effective June 5, 1981.

Also on June 4, 1981, CIPS announced that it had entered into a contract to obtain the entire coal requirements of its Coffeen Station from Exxon Coal's Monterey Mine in Carlinville, Illinois. It appears that CIPS

began negotiations to purchase its requirements from the Monterey Mine and committed itself to such a contract several months prior to June 4, 1981. Nevertheless, prior to that date, CIPS gave no notice to Consol that it was terminating the contract between Consol and CIPS on the next day, June 5, 1981.

Consol's argument, which finds support in the record here, is that because the Hillsboro Mine is designed and constructed to deliver its entire output to the Coffeen Station, it is difficult to deliver and sell coal to users other than CIPS without time-consuming major alterations. CIPS' one-day notice to Consol of its refusal to accept deliveries, ostensibly leaves Consol with little alternative but to shut down the Hillsboro Mine.

Consol currently employs approximately 482 people at the Hillsboro Mine, 404 United Mine Workers and 78 persons on salary. The closing of the Mine will terminate the employment of virtually all of those people.

In giving one day's notice of termination, Consol claims that CIPS has not only disregarded the contractually required five year notice, but in so doing CIPS has eliminated the opportunity for Consol to consider alternative markets for Hillsboro coal during a period when Consol's labor and management force are intact. Consol also claims that CIPS' actions will threaten the livelihood of 482 people who have had no opportunity to make an orderly transition to new employment. It is claimed that Consol and its employees will be irreparably harmed in that:

(a) Consol will lose its massive capital investment in the Hillsboro Mine without the chance to recoupe its investment by selling coal to CIPS until March 1, 1986, as the contract provides;

(b) The immediate shutdown of the Mine and the loss of its labor force will severely impair, if not eliminate, any chance for Consol to consider and make a decision with respect to alternative markets for the Hillsboro reserves;

(c) Consol's employees, most of whom were preparing to resume working and earning wages after the strike, will be laid off with virtually no notice;

(d) Consol's reputation will suffer for having laid off its employees in such an abrupt manner, making labor relations even more difficult in an already contentious atmosphere;

(e) Consol will be forced to wind up the operations at the Hillsboro Mine without any prior notice, precluding the orderly shutdown that could have been scheduled if Consol had been given the five year notice required by the contract;

(f) Consol will be placed in a disadvantageous bargaining position in any negotiations to divest itself of the Hillsboro reserves dedicated to the CIPS contract;

(g) Consol's damages will be difficult to ascertain in an action at law.

In addition, it is claimed that the public interest demands the immediate relief herein requested by Consol.

CIPS' claim is that the quality of the Hillsboro coal renders it economically infeasible to use at the Coffeen Station. But the record demonstrates that CIPS knew as much as Consol did about the quality of the Hillsboro reserves before building the Coffeen Station and had its boilers designed for that specific coal. The contract contemplated that at some future date continuation of the contract might become "uneconomical or impractical". (Article VI). A fair consideration of the evidence before this Court leads to the conclusion preliminarily that such is the case here. In that event, either party had the right to terminate after December 20, 1980, on five years' written notice.

### DISCUSSION

It has been CIPS' contention throughout these proceedings that this Court lacks the power to grant preliminary injunctive relief to Consol. The primary basis for this contention is that the Uniform Commercial Code does not expressly provide for specific performance as a remedy for the seller. While it is true that Ill.Rev.Stat. ch. 26 § 2–703 catalogs the seller's remedies, *see*

Illinois Code Comment and Uniform Commercial Code Comment thereto, my preliminary conclusion is that it does not purport to establish exclusively any and all remedies available to the seller. CIPS has been unable to present to the Court a single case which would preclude the grant of specific performance to a seller in appropriate circumstances. Nor has CIPS submitted a single case which holds that specific performance is not an available remedy to a seller who is a party to a contract governed by the Uniform Commercial Code.

Consol relies on Ill.Rev.Stat. ch. 26 § 1–103 as support for its position that equitable principles supplement the remedial provisions of the U.C.C. The Court recognizes that ordinarily a seller's right to an action for the price under Ill.Rev.Stat. ch. 26 § 2–709 would constitute the equivalent of specific performance granted to the buyer under § 2–716 of the Code. However, the Court is convinced that in unusual circumstances, such as those present in this case, an award of specific performance could be granted to a seller. "[T]he Uniform Commercial Code does not purport to provide exclusively for the remedies available to the seller, who may also resort to other principles of law and equity for relief." 67 Am. Jur.2d § 552 at 742. *See also,* 67 Am.Jur.2d § 556 at 747, "[U]nder certain circumstances, specific performance on behalf of the seller has been permitted, as where payment was to be made in a particular manner, and the remedy at law was inadequate."

Consol has also cited to the Court several pre-U.C.C. cases which granted specific performance to sellers where the facts mandated such relief. *See, e. g. United Fuel Gas Co. v. Columbian Fuel Corp.,* 165 F.2d 746 (4th Cir. 1948); *Allen W. Hinkel Dry Goods Co. v. Wichison Industrial Gas Co.,* 64 F.2d 881 (10th Cir. 1933); and, *Oklahoma Natural Gas Corp. v. Municipal Gas Co.,* 38 F.2d 444 (10th Cir. 1930).

Having tentatively determined that specific performance could be granted to a seller in appropriate circumstances, the Court now turns to the question of whether preliminary injunctive relief should issue in this case.

In order to obtain a preliminary injunction, the petitioner must establish: (1) a reasonable likelihood of success on the merits; (2) irreparable injury and lack of an adequate remedy at law; (3) that the threatened harm to the petitioner outweighs the harm the injunction may cause the non-moving party; and, (4) that the granting of the injunction will not disserve the public interest. *Ciechon v. City of Chicago,* 634 F.2d 1055, 1057 (7th Cir. 1980); *American Dairy Queen Corp. v. Brown-Port Co.,* 621 F.2d 255, 257 (7th Cir. 1980); *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir. 1976).

*Likelihood of Success on Merits*

The requirement of a "reasonable likelihood of success" is "necessarily a somewhat flexible standard that allows the chancellor room for the exercise of judgment." *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290, 293 (7th Cir. 1974) quoted with approval in *Fox Valley Harvestore,* 545 F.2d at 1098. Thus

[t]he greater the urgency and the greater the extent of the impending injury, the more appropriate it may be to retain the status quo temporarily while the court appraises the strength of the legal claim.... At the very least, however, plaintiff must demonstrate that his claims are 'so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.'

*Mullis,* 502 F.2d at 293 (citations omitted).

The Court feels that the evidence produced during the preliminary injunction hearing by Consol at the very least raises serious and substantial questions which are so difficult and doubtful as to make them a fair ground for litigation. Furthermore, the Court is reluctant to permit the destruction of the subject matter of this five year old litigation when it is obvious that more deliberate investigation is required than could be accomplished in a two-day hearing on temporary relief.

■ Not only has Consol raised substantial and difficult legal questions, it has also established a reasonable likelihood of success on the merits. The contract language relating to the BTU levels of the coal to be supplied to CIPS appears far from constituting a guarantee of a minimum quality level. The contract provides in Article V as follows:

The coal delivered hereunder is *estimated* to have an average calorific value of 9,800 Btu per pound 'as received' with a minimum, delivered on a monthly basis, of 9,500 Btu per pound 'as received'. If the quality should fall below an average of 9,500 Btu per pound 'as received' during any calendar month, CONSOL shall take corrective action to raise the monthly average calorific value to 9,500 Btu per pound. CONSOL shall operate the mine as to keep to a minimum in the coal, any extraneous material such as wood, tramp iron, or roof rock. (Emphasis added).

Furthermore, during negotiations of the agreement, CIPS sought to insert a right of rejection if the BTU levels fell below 9500. This provision was omitted from the final agreement. *See*, Defendant's ex. 15.

Consol's testing of the BTU content of the coal differs significantly from the test results achieved by CIPS. Its results show that for the months of January, February and March, 1981, the BTU content of the coal exceeded 9500 and thus indicates substantial compliance with the contract at the present time.

Additionally, the evidence indicates that since this contract was executed, economic conditions concerning the mining of coal have changed. There is currently a surplus of coal for sale in Illinois, enabling CIPS to obtain a contract with Exxon Corporation for better quality coal at a slightly lower price than that being paid for Hillsboro coal. While this contract may have become economically impracticable for CIPS, the contract requires five years' written notice of termination in this event.

Lastly, it seems to this Court that the agreement between the parties contains elements, in some respects, of a joint venture.

The Coffeen Station was designed and constructed as a "mine mouth plant." CIPS selected the location for the Coffeen Station and Consol located the Hillsboro Mine adjacent to the Coffeen Station so that the raw coal would be hoisted from the ground and delivered by conveyor belt to a stockpile maintained by CIPS.

The core samples were made available to CIPS for testing prior to entering into the 1962 agreement. Defendant's ex. 28 at 32–33, 42. CIPS had experts examine the core analyses also in order to render an opinion of the anticipated quality of the coal. Thus, it appears that CIPS entered into this agreement with every opportunity to determine the quality of the coal contained in the Hillsboro reserves.

### Irreparable Injury

■ On June 4, 1981, CIPS notified Consol that it would refuse to accept further deliveries of Hillsboro coal effective June 5, 1981. This one day notice has necessitated the shutdown of the Hillsboro Mine without the opportunity for Consol to make an orderly transition to supplying another coal user. The Hillsboro Mine was designed to produce raw coal for the Coffeen Station and there are no washing facilities at the plant. Few purchasers of coal today seek raw coal, but instead want to purchase washed coal. The Mine was designed to deliver coal to CIPS via conveyor belt, thus there are no trucking or loading facilities at this Mine.

CIPS contends that it gave notice to Consol in August of 1980 that it was going to seek a new longterm supplier of coal. CIPS invited Consol to bid along with other potential suppliers. The earliest period for which bids were sought was to commence in January of 1983. Proposals for a term to start in 1984 and 1986 were also sought. Additionally, CIPS requested proposals for an interim supply of coal of 500,000 tons per year to begin January 1, 1981 and to continue for two, three or five years, depending upon which longterm proposal was accepted by CIPS. *See*, joint ex. J. Rather than giving Consol notice of imminent termina-

tion, this solicitation of bids indeed could have induced reliance on Consol's part that the contract would not be terminated until at least 1983. Significantly, while their miners were on strike during the Spring of 1981, Consol expended substantial sums to prepare the Mine for reopening upon ratification of the new contract by the miners.

CIPS explained its failure to give adequate notice to Consol on the basis that it feared Consol would cease to supply coal to CIPS if it knew that CIPS was negotiating a contract with a new source of coal. So instead, CIPS kept its intentions secret and when it had lined up a new supplier, terminated Consol with only one day's notice. CIPS did to Consol exactly what it did not want Consol to do to it. Consequently, Consol was given no time to find a substitute purchaser, nor time to alter its operations to increase the likelihood of obtaining a new purchaser.

Lastly, since this is a longterm requirements contract involving significant capital investment, it appears that Consol has no adequate remedy at law because its damages will be very difficult of ascertainment.

### Balance of the Hardships

Although CIPS contends that it will sustain substantial damage if a preliminary injunction issues, this Court intends to condition the granting of a preliminary injunction upon the tender of a substantial bond by Consol. Such a bond will protect CIPS and its ratepayers in the event the issuance of this injunction is later determined to have been improvidently issued. Furthermore, the Court seriously questions the amount of damage which could be sustained by CIPS while the status quo is temporarily preserved pending an expedited trial on the merits. CIPS has been utilizing Hillsboro coal since 1965. Indeed, the Coffeen Station has operated at a cost to CIPS less than any of its other stations, with the exception of several years when it was second least costly to run. (Defendant's ex. 22). Requiring it to use, for a brief period, what it has been using for the past sixteen years is outweighed by the harm to defend-

ant if CIPS is allowed to terminate this contract upon only one day's notice.

### The Public Interest

Again, CIPS alleges that its ratepayers will be harmed by the increased costs it sustains as a result of burning the "inferior" Hillsboro coal. The Court notes, as indicated above, that a sufficiently high bond will protect CIPS' ratepayers. In view of the fact that this coal has been used for many years, it is difficult to see how preserving the status quo for several more months will have the extreme results claimed by CIPS. On the other hand, approximately 500 people will have lost their jobs with virtually no notice in the event an injunction does not issue. Millions of dollars per month will be eliminated from the rural Hillsboro area economy. The economic devastation to the people and community is apparent. On balance, the Court determines that the issuance of a preliminary injunction will not disserve the public interest.

Accordingly, the Court will issue a preliminary injunction preserving the status quo until such time as the parties can be ready for trial. This Court is willing to accommodate the parties and will schedule a trial date at the earliest possible time to which the parties can agree. The status quo for purposes of this injunction is the sale by Consol to CIPS of 1.7 million tons of coal on an annual basis. CIPS is not precluded by this injunction from purchasing coal from other suppliers if it so desires.

Furthermore, Consol shall post a bond in the amount of $145 million. In addition, counsel for Consol has represented to this Court that BTU levels of 9500 are presently achievable at the Hillsboro Mine. Accordingly, this injunction is granted on the condition that Consol take any and all necessary corrective action, including the expenditure of capital to maintain appropriate BTU levels during the period of the preliminary injunction.

Parenthetically, the procedural history of this case is, to say the least, disturbing. In

1976, CIPS filed a lawsuit in this Court, alleging that Consol was in breach of the coal supply agreement and demanding specific performance of the 1970 agreement. For a minimum of three to four years, the parties represented to this Court that they were attempting to resolve their differences amicably, and that the chances of such settlement were optimistic. Accordingly, based on these assurances, the Court allowed this case to sit idle for a lengthy period. When it became evident that further negotiations would be futile, the parties began to undertake discovery and proceed toward trial.

The most disturbing aspect of this matter is that the case has been pending for five years, the parties were aware of their problems and their failure to resolve them. The Court feels certain that the parties were able to foresee the direction in which this case was heading. Yet, neither party approached the Court for aid in the resolution of their differences. Thus, what should and could have been decided in a rational, orderly fashion has instead been presented to the Court for immediate decision in the form of an emergency.

Lastly, this decision should in no way be construed as reflecting adversely on the actions of President Donald Raymer or other CIPS executives. The Court recognizes that their primary duty is to their stockholders and to their ratepayers. The Court believes that their regret at the potentially devastating effect of their decision to terminate the Consol contract with only one day's notice on the five hundred employees of the Hillsboro Mine and on the Hillsboro community is sincere. Nevertheless, the equities involved in this case mandate the issuance of temporary relief.

In summary, a preliminary injunction shall issue, enjoining CIPS from breaching the contract by failing to maintain its current purchases of 1.7 million tons of coal on an annual basis from Consol, upon the following specific conditions:

(1) Consol shall post a bond in the amount of $145 million for the purpose of reimbursing CIPS for its damages if it is later determined that this preliminary injunction was improvidently issued.

(2) Consol shall take any and all necessary corrective action, including the expenditure of capital, to maintain appropriate BTU levels during the time that this preliminary injunction is in effect.