STATE OF MAINE

BUSINESS AND CONSUMER COURT
BCD-CV-17-18

Cumberland, ss

PASSAMAQUODDY WILD BLUEBERRY
COMPANY,

     Plaintiff

v.

**ORDER ON MOTION FOR
REMITTITUR
OR FOR NEW TRIAL**

CHERRYFIELD FOODS, INC. and
OXFORD FROZEN FOOD LIMITED,

     Defendants

Before the Court is a Motion for Remittitur or for New Trial brought by Defendants

Cherryfield Foods, Inc. and Oxford Frozen Food Limited. Oral argument was held on August 30,

2019. Thereafter the parties filed further written submissions, the last of which were received on

October 30, 2019 once certain portions of the trial transcript were prepared and received.

Plaintiff Passamaquoddy Wild Blueberry Company (PWBC) is represented by Attorneys Daniel

Mitchell, John Woodcock III and Benjamin Dexter. Defendants are represented by Attorneys

John Aromando, Sara Murphy and Eric Wycoff. The Court has reviewed the written submissions

of the parties, the portions of the trial transcripts provided, pertinent case law, and issues the

following order denying the motion.

1

**STANDARD OF REVIEW**

Defendants bring this motion under M.R. Civ. P. 59(a) seeking a remittitur of damages or a new trial on Count I of Plaintiff's Complaint. Defendants also seek an amendment of the Judgment pursuant to M.R. Civ. P 59(e) to strike the award of interest made by the Court after the jury verdict. Defendants claim that the jury verdict on Count 1 bears no rational relationship to the evidence admitted at trial, and further that the Court should not have provided for interest as the Plaintiff had included interest as a component of its damages in its presentation and argument to the jury.[1]

*Remittitur and New Trial*

At the outset, the Court has been asked by Defendants to decide if Plaintiff is correct that the jury could have considered "sunken" as well as "avoided" costs, or if the Defendant is correct that this would be "double counting." Under Maine law, Plaintiff is entitled to the contract price for its 2017 crop, "but less expenses saved *in consequence of the Defendant's breach*." [emphasis added, pg. 3 Defendant's Reply, citing 11 M.R.S. 2-708(1)]. The overriding principle, as the parties agree and as the jury was instructed, is to place the Plaintiff in as good a position it would have enjoyed had there been no breach. Plaintiff is not entitled to recover for costs expended before the breach occurred if those costs would have been expended even without a breach.

It follows then, that determining the amount of damages Defendant owed Plaintiff for breach of their contract in 2017 required reasonable, retrospective *estimates* about two things.

---

[1] In their Opposition to the motion Plaintiff agreed that the jury made a mathematical error in calculating the amount of its verdict on Count I. Plaintiff agrees that the correct amount should be $1,166,886 instead of $1,167,066 which was the calculation made by the jury. The Court will amend the Judgment accordingly.

First, the jury had to reasonably estimate, based upon the evidence presented, the number of pounds of berries that could have been harvested in 2017, and to multiply that number by the contract price. Second, the jury had to reasonably estimate, based upon the evidence presented, the costs that PWBC would have been able to avoid by not having to perform their obligations under the contract in 2017. In contrast to the costs Plaintiff avoided through breach, expenditures made in preparation of performance on the contract, prior to breach, would have been incurred regardless. Awarding Plaintiff the estimated contract price for their berries minus avoided costs puts Plaintiff in the position they expected to be in prior to breach. Therefore additional, expected sunk costs are not recoverable in this case.

The jury was instructed on how to calculate damages in Count I as follows: "With respect to Count I, you must calculate the damages that Plaintiff would have recovered from Defendants if Defendants had purchased Plaintiff's crop in 2017. *This requires you to determine the contract price Plaintiff would have obtained for blueberries had they been grown, less any expenses Plaintiff saved or avoided because it did not cultivate and harvest blueberries that year."* [emphasis added]. The Court does not believe that there was any objection to this instruction by either party. More importantly, the Court believes that this is a correct statement of the measure of damages in this case. The next question for the Court becomes whether the jury verdict is rationally based on the evidence.

In *C.N. Brown Co. v. Gillen,* 569 A.2d 1206, 1209 (Me. 1990) the Law Court stated what is now oft-repeated as the standard for granting a new trial. The Court held that the assessment of damages is "the sole province of the jury, and the amount fixed must not be disturbed by the Court unless it is apparent that the jury acted under some bias, prejudice or improper influence, or made some mistake of law or fact." In order to prevail on a motion brought under Rule 59(a)

3

the moving party must therefore "show that the jury verdict was so manifestly or clearly wrong that it is apparent that the conclusion of the jury was the result of prejudice, bias, passion, or a mistake of law or fact." *Binette v. Dean,* 391 A.2d 811.

Defendants do not point to any evidence of prejudice, bias or passion on the part of the jury, and they do not argue that the jury improperly disregarded any instruction, including the instruction on how to calculate the damages recoverable under Count I.[2] Instead, the Defendants essentially argue that the jury was required to pick one or the other of the calculations made by the competing experts, Dr. Yarborough (for Defendants) or Eric Purvis (for Plaintiff) both as to the amount of berries that would likely have been harvested and as to what that same expert testified about the avoided costs. That is, the Defendants assert that no rational jury could have done anything other than select numbers actually posited by either expert, or alternatively, selected numbers that fell in between Plaintiff's expert's "high" numbers and Defendants' experts "low numbers" for both berries and for avoided costs. As Defendants state in their brief, "no other figures are supported by *credible* evidence at trial."

The Court agrees that it would have been "rational" or "reasonable" for the jury to do just that: select one of the expert's estimates both as to berries an as to costs, or to select figures within the "boundaries" set by the experts. That is what a judicial factfinder might do, or what another jury might do. However, that does not mean that the jury could not take other rational approaches to making their own estimates as to what the crop would have yielded and what costs could have been avoided. In addition, Defendants' argument overlooks the instruction that Maine juries are given about how to evaluate testimony from witnesses, including expert witnesses.

---

[2] The Defendants argument regarding sunk costs v. avoided costs seems directed at rebutting Plaintiff's arguments in this motion on how the jury may have arrived at their figure on avoided costs, but Defendants do not seem to be suggesting that the jury disregarded the Court's instruction on how to determine avoided costs.

They are told, and were told in this case, that they should evaluate the testimony of the experts the same way that they evaluate the testimony of other witnesses. *Alexander, Maine Jury Instruction Manual* Section 6-20. They were also told, with respect to evaluating witness testimony generally, that they are to make their own judgment on credibility, and give the testimony of each witness such significance, if any, that they think it deserves. *Id.* Section 6-24. Defendants seem to be asking the Court at least implicitly to decide which witnesses were most credible and the Court is not willing to do so.

It is noteworthy that Defendants do not here challenge the jury's prediction or estimate of the number of blueberries that PWBC would have grown had Defendants not breached the contract. Their challenge focuses only on the jury's estimate of avoided costs being lower than posited by either expert including their own expert, Dr. Yarborough. As noted by the parties, both experts' estimates of avoided costs seem largely driven by the numbers of pounds they estimate PWBC would have grown in 2017, but the experts used significantly different approaches and methodologies as the foundations for their opinion. Plaintiff's expert estimated that PWBC would have grown between 6.5 or 6.8 million pounds, while Defendants' expert estimated that PWBC would have grown only 3.2 million pounds. Both experts did acknowledge that they were dealing with a fair amount of uncertainty in making what were, in all actuality, reasonable estimates. The jury's determination that 4.4 million pounds would have been harvested may have resulted from the jury computing an approximate average of numbers posited by the parties' experts. Or, the jury's determination could be viewed as discounting by approximately one third the number of pounds posited by Plaintiff's expert. In any event, the Defendants do not challenge the jury's determination of the yield estimated for 2017.

With respect to avoided costs, however, the Defendants seem to be saying that the jury could not make their own independent determination, and instead had to rely solely upon the experts. The Court does not believe this to be the law in Maine. Plaintiff's expert calculated avoided costs to be approximately 1.6 million dollars, while Defendants' expert estimated 1.2 million dollars. The jury determined those costs to be $915, 972. Obviously, the jury's number is much closer to the number posited by Defendants' expert than that posited by Plaintiff's and it may represent a discounting of approximately one quarter of the defense expert's estimate. Defendant insists, however, that no rational jury could do anything other than find a number in between the numbers posited by the experts, both as to poundage and as to avoided costs.

The Court concludes that there is competent evidence in the record supporting the figure the jury found for avoided costs, even if that figure was lower than either expert estimated. There was evidence of prior yields in the record suggesting that yields do not always increase in direct proportion to inputs or costs expended. For example, cutting back on the number of hives in a particular year does not necessarily mean that the yield in that particular year would decrease, or would decrease in proportion to the decrease in the number of hives. The same can be said about "inputs" such as fertilizers, insecticides or fungicides. Weather is always a critical factor, everyone agreed. Given all these uncertainties, the Court does not find it fundamentally irrational for a jury to make independent adjustments, as they saw fit to make, to the experts' opinions both as to poundage as well as to avoided costs. If the jury's discounting of the Plaintiff's opinion for poundage was rationally based - which Defendants seem to be accept - they would be hard pressed to convince the Court that the jury's discounting – if that is what occurred here – of Defendants' experts estimate of avoided costs – constituted an irrational act.

6

Because this was a jury trial, the truth is, no one can be precisely sure as to how the jurors arrived at these numbers. No motion for further findings of fact can be made after a jury verdict. But the Defendants have failed to point to evidence that any of the jury's determinations were the result of bias, prejudice, improper evidence, or that they were based upon an error of law or fact. Indeed, it seems likely to the Court that the jury agreed with Dr. Yarborough more than they did with Mr, Purvis, both as to poundage and to avoided costs, as the jury's numbers for both were closer to Dr. Yarborough's numbers than to Mr. Purvis' s numbers. As noted above, juries in Maine are instructed that they alone are to determine the credibility of witnesses, including witnesses who testify as experts. The Court concludes that the jury verdict was not "so manifestly or clearly wrong" to justify the granting of this motion.

### *Interest calculation made by the Court*

The Defendants ask the Court to amend the judgment to strike language awarding statutory interest to Plaintiff. While the Court agrees that Plaintiff included interest in their calculations, the jury clearly asked the Court if they should include interest in the *jury's* calculation of interest and the Court clearly responded by saying that they should not. It is abundantly clear from this verdict that the jury did not accept at face value the calculations made by the experts for the parties, and that they made their own calculations. In light of their question and the Court's answer, the motion to amend the judgment to strike any award of interest will be denied.

The entry will be: Motion for Remittitur or for New Trial is DENIED, and Motion to Amend the Judgment is DENIED.

7

The Clerk may note this Order on the docket by reference pursuant to Rule 79(a) of the Maine

Rules of Civil Procedure.


__November 15, 2019_____                    _____/s_____
          **DATE**                                        **M. Michaela Murphy**
                                                          **Justice, Business and Consumer Court**

STATE OF MAINE                          BUSINESSS AND CONSUMER COURT
Cumberland, ss                          BCD-CV-17-18

PASSAMAQUODDY WILD BLUEBERRY
COMPANY,

      Plaintiff


v.                                                      **ORDER ON PLAINTIFF'S**
                                                        **APPLICATION FOR AWARD**
                                                        **OF ATTORNEY'S FEES**
                                                        **AND COSTS**

CHERRYFIELD FOODS, INC. and
OXFORD FROZEN FOODS LIMITED,

      Defendants



      Before the Court is an Application for Award of Attorney's Fees and Costs brought by Plaintiff. Plaintiff is represented by Attorneys Daniel Mitchell, John Woodcock III and Benjamin Dexter. Defendants Cherryfield Foods, Inc. and Oxford Frozen Foods are represented by Attorneys John Aromando, Sara Murphy, and Eric Wycoff.

      The Court has reviewed the substantive orders issued in this litigation, together with the filings made on this Application including the voluminous Exhibits,[1] the last of which was

---

[1] On November 26, 2019 the Court received from the parties a Notice of Satisfaction and Judgment that was filed after the Court issued its Order denying Defendants' Motion for Remittitur or for New Trial. The Satisfaction of

received on November 14, 2019, and issues the following order awarding attorney's fees and costs as set forth below.

## STANDARD OF REVIEW

The contract between the parties as it pertains to the litigation between them reads in pertinent part as follows: "Failure to make timely payments as set forth above shall, in addition to other remedies at law or in equity, subject [Cherryfield] to compound interest of 1% above Prime Rate, accruing daily on the outstanding balance, *plus costs of collection therewith, including reasonable attorney's fees."* Trial Ex. J2 Section 12, emphasis added. The Court will address the issues presented in regards to counsel fees and costs separately.

### *Award of Attorney's Fees*

In *Poussard v. Commercial Credit Plan, Inc.,* 479 A.2d 881 (Me. 1984) the Law Court stated that the factors listed in *Johnson v. Georgia Highway Express, Inc.* 488 F.2d 714, 717-719 (5th Cir. 1974) are to be used in determining the reasonableness of counsel fees. Those are: 1) the time and labor required; 2) the novelty and difficulty of the questions presented; 3) the skill required to perform the legal services; 4) the preclusion of other employment by the attorneys due to acceptance of the case; 5) the customary fee in the community; 6) whether the fee is fixed or contingent; 7) the time limitations imposed by client or circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorneys; 10) the undesirability of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. Before considering if those factors apply to this litigation,

Judgment included payment in full for damages recovered by Plaintiff after the jury verdict, including all pre- and post-judgment interest. This left for decision only the pending Application for Attorney's Fees and Costs.

2

the Court must decide as an initial matter whether Plaintiff is entitled to an award of counsel fees for work performed by the law firm that initially filed this case on Plaintiff's behalf.

While the attorneys for the parties spend most of their efforts debating what they sometimes refer to as the "Johnson" factors, the Court has to grapple with an issue that is unique in its experience, namely whether the first firm that represented Plaintiff can join in this Application, when almost 20 years ago the firm had obtained conflict of interest waivers from both Plaintiff and Cherryfield. Those waivers enabled it to represent both parties in negotiating the contracts at issue in this case, in exchange for the law firm agreeing not to represent either party if a dispute or disagreement arose between these parties. Based upon the record before the Court it is clear that when Drummond Woodsum (DW) began its representation of the Plaintiff in 2017, its attorneys did so without having actual knowledge of the conflict of interest waiver, [2] and no one is suggesting otherwise. In addition, it is clear to the Court that the work performed by DW attorneys resulted in an excellent result for Plaintiff, and that their representation of Plaintiff in the early stages of this litigation was done in good faith. Again, no one is suggesting otherwise. Nor is anyone suggesting that DW used any confidential information that it may have obtained from Cherryfield when it undertook its legal, joint representation of the parties back in 1997 and 1998 when the contracts were negotiated.

Neither party cites any case law in support of their positions on this issue, and the Court could not find any. The issue for the Court, therefore, becomes whether it should exercise its discretion in awarding counsel fees for the work performed by DW counsel, and the Court has concluded that it should not. Fundamentally, the Court does not think it would be reasonable or

---

[2] It is also clear from the record that, when this litigation began, counsel for Cherryfield also lacked actual knowledge of the waiver as it took approximately 7 months after the lawsuit was filed for Defendants' counsel to raise the issue. DW withdrew days after this was discovered.

just for the Court to order Cherryfield to pay counsel fees for DW's services under these circumstances. While Plaintiff asserts that the waivers did not constitute a contract between Plaintiff and Cherryfield, the waivers were in part, in the Court's view, a contract between DW and Cherryfield. The Court concludes that Cherryfield was entitled to rely upon that contract insofar as it barred DW from representing Plaintiff in litigation about the contract.

With respect to the services provided by Plaintiff's second law firm, Defendants make a number of arguments, but its central assertion is that Plaintiff's counsel did not exercise proper "billing judgment between the hours actually spent litigating this dispute in its entirety and the amount reasonably spent pursuing the specific contract claims on which it prevailed." [Defendants' Opposition brief, pg. 7]. The Superior Court has stated with respect to "billing judgment" that if fee applicants do not exercise it, "courts are obligated to do it for them, to cut the amount of hours for which payment is sought, pruning out those that are excessive, redundant, or otherwise unnecessary." *Mowles v. Maine Com'n on Governmental Ethics & Election Practices,* 2009 WL 1747859 (Me. Super. Ct. April 10, 2009). Courts are permitted to conduct a line-by-line analysis, or may reduce the number of hours by percentages. *Gates v. Deukmejian,* 987 F. 2d 1392, 1400 (9th Cir. 1992). However, as pointed out by Plaintiff, in statutory fee-shifting cases emphasis is usually placed on awarding fees in "proportion" to the success of the party asking for the award, and *Mowles* was such a case. But when considering bargained-for fee awards, courts focus on whether or not it was "reasonable to do such work in enforcing the agreement." *St. Hilaire v. Industrial Roofing,* 416 F. Supp. 2d, 137, 146 (D. Me. 2006). The Court has concluded that this is the approach that it should take in determining a fair and just fee award.

The Court has reviewed the bills submitted by both law firms that represented the Plaintiff in this litigation. As noted above, the Court declined to award fees to the initial law firm that represented the Plaintiff, but it is clear that both firms billed for services for multiple attorneys, paralegals and legal assistants. Defendants have asserted that billing for multiple professionals was somehow improper, but the Court cannot find on this record that it was. In addition, as pointed out by Plaintiff's counsel, the number of hours spent on the case by attorneys other than Attorneys Mitchell, Woodcock and Dexter were very few, and the Court is not troubled by the fact that other more senior partners weighed in on the matter at certain, limited junctures. Perhaps the best basis for comparison the Court could make as to the reasonableness of the amount of time spent and hourly fees charged would be to consider Defense counsel's charges to their clients, but that is not in the record. Nor have Defendants proffered any independent expert opinion suggesting that the amounts billed or hourly rates were inappropriate. The Court therefore finds unpersuasive Defendants' arguments regarding "billing judgment" and finds that it was reasonable to do the work that was in fact performed in order to enforce the contractual provision. [3]

The Court agrees with counsel for the Plaintiff that this case was "a long and hard-fought action." It was vigorously prosecuted - and defended - by exceptionally able and very experienced counsel. Discovery was extensively conducted by both sides, the case was document-intensive and expert-heavy, and the issues that survived extensive motion practice had

---

[3] Even if the Court were to strictly apply the "proportion to success" approach most commonly used in statutory fee-shifting awards, the Court would find in this case that the tort claims that were brought and later dismissed were appropriately raised "alternative legal grounds for a desired outcome." *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983). In addition, the Court would find that the tort claims that were dismissed and the contract claims that went to trial involved a "common core of facts." *Id.* 435.

to be decided by a Maine jury who unanimously found in favor of the Plaintiff on the issue of liability in both Counts.

In sum, with the exception of any fees charged that Plaintiff has conceded were mistakenly double-billed,[4] or that were the result of the "tare" litigation that was settled before trial, the Court will award the fees requested by Plaintiff. This would include work performed by Plaintiff's counsel up to and including the date the Satisfaction of Judgment was filed with the Court. Counsel for Plaintiff is ordered to review the most recent bill submitted, ensure the adjustments ordered hereine have been made, and provide it to counsel for Defendants and to the Court within 14 days of the date of this order, unless further time is requested by either party.

### Costs

The Court has reviewed the costs requested by Plaintiff, the costs authorized by Maine law, and has considered the parties' positions regarding the language in the controlling contract that states that "costs of collection" are recoverable. In *Hilaire & Associates v. Harbor Corp.,* 607 A.2d 905 (Me. 1992) the Law Court held that contract provisions imposing the obligation to pay reasonable costs of collection serve to reimburse the creditor for the loss suffered. The test "is one of reasonableness: if such provisions reflect the anticipated or actual loss caused by the default and are not usurious or excessive so as to constitute a penalty, they will be enforced." *Id.* at 907.

---

[4] These adjustments would also include fees mistakenly billed or duplicatively billed. It is not clear to the Court from the parties' filings if Plaintiff agrees that the entries coded "6" in Attorney Sara Murphy's affidavit were mistakenly billed, and/or if those coded "10" were duplicative of other entries. The Court would request that counsel for the parties confer to see if these issues can be resolved, and to seek court intervention only if necessary to resolve the issue.

The starting point for the Court would be to grant costs allowed by statute, and then to determine if the additional costs requested are "reasonable" and not "excessive."

The award of costs would therefore include all filing fees paid to the Clerk; fees for service of process; attendance fees and travel costs paid to any witness; travel expenses within the State for Plaintiff's three trial counsel for the trial itself; expert witness fees and expenses for Michael LaVert and Eric Purvis as stated in Attorney Mitchell's affidavit; and costs incurred in the taking of depositions in the amount of $11,597.95. All of these costs are provided for by law as "recoverable costs" or "expert costs" under 14 MRS 1502-B or 1502-C.

Other costs which the Court finds to be reasonable would be the costs for electronic discovery analysis and management in the amount of $13,164.81; and costs for the presentation of electronic evidence and expert testimony in the amount of $22,757.69. The Court would also award costs for lodging for Plaintiff's three trial counsel trial, but not for food. The Court declines to award costs for jury consultation in the amount of $2300, costs for Fed Ex, supplies purchased for this trial, or for the cost of the projector.

Finally, the Court will award costs to DW for disbursements made by that firm for filing fees, sheriff's fees, and recording fees at the Registry of Deeds, but declines to award costs for conference call and photocopying charges. The costs awarded would have been incurred by any firm that represented Plaintiff in the early stages of this litigation, as opposed to the award of costs of representation by DW counsel, for reasons explained above.

As the costs awarded require further computation, counsel for the Plaintiff shall have 14 days from the date of this order to provide a new list and computation of those costs to the Court and to opposing counsel.

The entry will be: Application for Award of Attorney's Fees and Costs is granted in part. Counsel for the Plaintiff shall submit new affidavit of counsel fees and new list and computation of costs consistent with this Order, within 14 days from the date of this Order. Any objection by Defendants to the new affidavit of counsel fees and costs shall be made within 10 days after Plaintiff makes its filings.


_December 10, 2019__                    _____/s_____
          Date                          M. Michaela Murphy
                                        Justice, Business and Consumer Court

STATE OF MAINE                                 SUPERIOR COURT
CUMBERLAND, ss.                                BUSINESS AND CONSUMER COURT
                                               LOCATION: PORTLAND
                                               DOCKET NO. BCD-CV-2017-18     ✓


PASSAMAQUODDY WILD                    )
BLUEBERRY CO.,                        )
                                     )
                                     )     **ORDER ON PLAINTIFF**
            Plaintiff,               )     **PASSAMAQUODDY WILD**
                                     )     **BLUEBERRY COMPANY'S**
      v.                             )     **MOTION FOR LEAVE TO AMEND**
                                     )     **COMPLAINT**
CHERRYFIELD FOODS, INC., et al.,     )
                                     )
            Defendants.


This matter comes before the Court on Plaintiff Passamaquoddy Wild Blueberry Company's ("PWBC") motion for leave to amend its Complaint against Cherryfield Foods, Inc. ("CFI") and Oxford Frozen Foods Limited (collectively "Defendants"). Defendants opposed the motion, and PWBC timely replied. The Court heard oral argument on the motion on March 25, 2018. Dan Mitchell, Esq. appeared for PWBC and John Aromando, Esq. appeared for Defendants.

## BACKGROUND

This case arises out of CFI's termination of a multi-year contract (the "Agreement")[1] for the purchase of PWBC's annual harvest of wild blueberries. (Pl's Compl. ¶¶ 14,18, 45, 52.)[2] CFI first gave PWBC notice of its intent to terminate the contract by a letter dated September 28, 2016. (Pl's Compl. ¶ 45.) By letter dated February 10, 2017, CFI notified PWBC that it considered its termination effective as of the 2017 harvest. PWBC filed its Complaint against

---

[1] The Agreement was initially executed in May 1998 and re-executed in November 2000 to incorporate certain amendments which, *inter alia*, extended the term of the Agreement through 2010 and provided for automatic extension beyond 2010.
[2] Except where indicated otherwise, citations and references are to the Complaint filed in April 2017 and not the Proposed First Amended Complaint.

Defendants on April 11, 2017, alleging *inter alia* that CFI's termination breached the Agreement's termination provision because the Agreement's automatic extension provision obligated CFI to purchase PWBC's annual harvest through 2020. (*See* Pl's Compl. ¶¶ 58-65.) On page 8 of its Order on Pending Motions entered June 20, 2017, this Court denied CFI's motion to dismiss the Complaint, finding that the plain language of the Agreement's termination provision unambiguously provided a four-year tail following a notice of termination by either party. On September 12, 2017, Defendants made an unqualified offer to purchase PWBC's entire blueberry harvest for the years 2018, 2019, and 2020, according to the same terms as the prior contract. Plaintiffs accepted the offer by letter dated September 26, 2017. Defendants served PWBC with an offer of judgment dated December 4, 2017; this offer was rejected. *See* M.R. Civ. P. 68.

Meanwhile, Defendants started a rolling production of documents in response to PWBC's discovery requests on September 8, 2017. After having last produced documents on November 4, 2017, Defendants made another production on January 12, 2018. This January production led PWBC to conclude that CFI had manipulated the "sales-based price" so that it would not appear to be the highest of three possible price alternatives CFI was obligated to pay PWBC pursuant to the Agreement.[3] The parties do not agree as to whether during the performance of the agreement CFI provided PWBC with adequate information as to how it calculated the sales-based price or its ultimate determination of the sales-based price. Now that PWBC has discovered what it believes to be evidence of allegedly results-oriented methodology in determining the sales-based price, PWBC seeks to amend its Complaint to bring claims for breach of contract (Proposed

---

[3] Under the Agreement, CFI was obligated to pay PWBC the highest of three possible calculations: (1) a "premium price," (2) a "minimum price," or (3) a "sales-based price." The minimum price was a sum certain; the premium price was calculated based on what CFI paid other suppliers that year; and the sales-based price was calculated based on what CFI would charge a defined sample of its customers the following year.

2

Count II), intentional misrepresentation (Proposed Count IV), and negligent misrepresentation (Proposed Count VII) based on this alleged manipulation.

## STANDARD OF REVIEW

Maine Rule of Civil Procedure 15(a) states that after a responsive pleading is served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party . . . ." *Id.* "Leave to amend a complaint 'shall be freely given when justice so requires.'" *Sherbert v. Remmel*, 2006 ME 116, ¶ 7, 908 A.2d 622 (quoting M.R. Civ. P. 15(a)). "A motion to amend a pleading . . . is committed to the sound discretion of the trial court." *Bangor Motor Co. v. Chapman*, 452 A.2d 389, 392 (Me. 1982).

## DISCUSSION

Defendants argue that these newly discovered claims would be more appropriately brought in a separate action. (Def's Opp. Mot. Amend 1-2, 10.) First, Defendants claim that PWBC's motion is untimely. (Def's Opp. Mot. Amend 5-7.) Second, Defendants claim that allowing PWBC to amend its claim will unfairly prejudice Defendants. (Def's Opp. Mot. Amend 7-9.)

### I. PWBC'S MOTION IS TIMELY

Defendants claim that PWBC should have brought this motion earlier, after Defendants' first two productions in the Fall of 2017.[4] PWBC counters that although some of the documents that form the basis of its new claim were produced in the Fall, the relevance of these documents to the new claim were not evident until the January 2018 production. At the oral argument,

---

[1] Defendants also suggest that PWBC should have had notice of the claims even earlier, because PWBC had the right to audit CFI's annual determination of the sales-based price under the Agreement but never exercised that right. (Def's Opp. Mot. Amend 7.) The Court disagrees with the implication that this renders the instant motion untimely. As counsel for PWBC pointed out at oral argument, PWBC's failure to exercise its audit rights may be relevant to a determination on the merits, but it does not foreclose PWBC from pursuing the claims in the proposed amendments.

3

counsel for PWBC explained that while some documents produced earlier are cited in the amendments, it was the documents produced in January that "tied it together" and prompted PWBC to bring the instant motion.

The Court accepts PWBC's characterization of how it became apprised of the factual underpinning to its new claims, and therefore agrees with PWBC that its motion is timely. The Court appreciates both parties' attempts to bring this suit to a speedy resolution, but PWBC cannot be faulted for conducting a diligent analysis of Defendant's produced documents. PWBC's motion to amend is timely under the circumstances.

As discussed *infra*, the proposed amendments will require a modification of the current schedule and delay trial. However, resulting delay alone is insufficient grounds for denying a motion to amend. *See Kelly v. Michaud's Ins. Agency*, 651 A.2d 345, 347 (Me. 1994). Furthermore, allowing PWBC to bring these new claims now will ultimately serve to conserve judicial resources. Defendants do not argue futility of amendment; they concede that if the Court denies PWBC's motion that PWBC should still be allowed to pursue its claims relating to the manipulation of the sales-based price. (Def's Opp. Mot. Amend 1-2, 10.) At oral argument, Defendant's counsel reaffirmed this position unequivocally. But the proposed amendments bring claims arising out of the same contract, involve the same parties, and—despite Defendants' assertions to the contrary—it is plausible that there will be some factual overlap. All of the procedural requirements necessary for starting a new lawsuit—and the motion practice necessary to transfer the second suit to this Court—are bypassed by simply allowing PWBC to bring its proposed claims now. In sum, allowing PWBC to amend its Complaint to bring the proposed claims will result in a net reduction of the time required to resolve all pending claims between these parties.

4

II.    ALLOWING   AMENDMENT   WILL   NOT   UNFAIRLY   PREJUDICE
DEFENDANTS

Defendants next argue that the motion to amend should not be granted because it would cause them undue prejudice. In particular, Defendants claim that the time and expense associated with further delay will result in unfair prejudice, and that Defendants would be further prejudiced by the proposed amendment because of the offer of judgment served on PWBC in December 2017.

The Court recognizes that allowing PWBC to amend its Complaint to bring these new claims will result in further commitments of time and resources by both parties. However, amendments that add new claims to a complaint almost always require a defendant to commit additional resources in order to defend against those claims. As counsel for PWBC pointed out at oral argument, the proposed amendments are expected to prejudice Defendants to the extent that they represent a new potential for liability. The prejudice Defendants allege in their opposition amounts to the additional commitment of resources to defend against the new proposed claims. The Court disagrees that this prejudice is unfair. The cases cited by Defendants fail to support their position. *See Bangor Motor Co. v. Chapman*, 452 A.2d 389. 393 (Me. 1982) (no undue prejudice where movants sought to assert a claim of negligence directly against third-party defendant); *Holden v. Weinschenk*, 1998 ME 185, ¶ 7, 715 A.2d 915 (affirming denial of motion to amend because of undue delay, as opposed to undue prejudice, when motion was brought after a motion for summary judgment was filed by the opposing party).

Similarly, the Court is not convinced that Defendants' service of an offer of judgment pursuant to M.R. Civ. P. 68 is relevant to the analysis of whether PWBC's proposed amendments would result in undue prejudice to Defendants. The Court acknowledges that Defendants made

5

their offer based on the claims that were then in issue—and which had been narrowed to a calculation of damages resulting from CFI's failure to purchase PWBC's 2017 blueberry harvest—but this is true of all strategic decisions Defendants have made thus far in litigation. Furthermore, the Court is not aware of any authority that prohibits the Defendants from serving a second or amended offer of judgment on PWBC, and Defendants do not direct the Court's attention to any such authority. In sum, while the proposed amendments may prejudice Defendants, the Court rules that any resulting prejudice would not be unfair.

## CONCLUSION

Based on the foregoing it is hereby ORDERED:

That Plaintiff PWBC's motion for leave to amend the Complaint is granted.

Unless otherwise agreed by the parties, the Case Management Scheduling Order is amended as follows:

Plaintiff's Expert Designations:     **May 25, 2018**

Defendant's Expert Designations:     **June 29, 2018**

Deadline to Complete Discovery:     **August 3, 2018**

Deadline for Dispositive Motions:     **September 28, 2018**

Trial Month:   **January 2019**

Deadline for Joint Pretrial Statement: **December 7, 2018**

Telephonic Pretrial Conference:     **December 21, 2018 at 9:00 am.**


Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporated this Order by reference in the docket.

6

Dated: 4/12/18

_(signature)_

Justice, Business & Consumer Court

Entered on the Docket: 4/12/18
Copies sent via Mail___ Electronically ✓

7

**Passamaquoddy Wild Blueberry Co. v.**
**Cherryfield Foods, Inc. and Oxford Frozen Foods, Ltd**

**BCD-CV-17-18**

### Passamaquoddy Wild Blueberry Co
### Plaintiff

Counsel:                                          Julia Petney, Esq.
                                                      Timothy Steigelman, Esq.
                                                      84 Marginal Way, Suite 600
                                                      Portland, ME  04104-2480

### Cherryfield Foods, Inc. and Oxford Frozen Foods, Ltd
### Defendants

Counsel:                                          John Aromando,, Esq.
                                                      Eric Wycoff, Esq.
                                                       Merrills Warf
                                                       254 Commercial St
                                                       Portland, ME 04101

STATE OF MAINE
CUMBERLAND, SS.

BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO. BCD-CV-17-18

PASSAMAQUODDY WILD
BLUEBERRY COMPANY,

  Plaintiff,

  v.

CHERRYFIELD FOODS, INC. and
OXFORD FROZEN FOODS LIMITED,

  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON PENDING MOTIONS**

Presently before the court are the following motions: (1) Defendants' Cherryfield Foods, Inc. ("CFI") and Oxford Frozen Foods Limited's ("Oxford")[1] motion to dismiss the complaint pursuant to Maine Rule of Civil Procedure 12(b)(6) for failure to state a claim; (2) Plaintiff Passamaquoddy Wild Blueberry Company's ("PWBC") motion for attachment and trustee process; and (3) PWBC's motion for a temporary restraining order and preliminary injunction. At the June 9, 2017 oral argument on the motioins, Plaintiffs were represented by Attorney Julia Pitney, and Defendants were represented by Attorney John Aromando.

## I. BACKGROUND

CFI is a Maine corporation engaged in the business of farming, harvesting, processing, freezing and marketing wild blueberries in the United States, Canada, and worldwide. (Kamp Aff. ¶ 3.) CFI is believed to be a wholly owned subsidiary of Oxford. (Compl. ¶ 13.)

---

[1] Cherryfield Foods, Inc. and Oxford Frozen Foods Limited collectively referred to as "Defendants."

From 1986 to 2011, the Passamaquoddy Tribe did business as the Northeastern Blueberry Company ("NEBCO"). (Paul Aff. ¶ 12.) NEBCO was engaged in the business of farming and harvesting Maine wild blueberries. (*Id.*)

On May 22, 1998, NEBCO, CFI, and Oxford executed a "Blueberry Purchase Agreement," whereby CFI agreed to ███████████████████████████████████ ████████████████████████ (the "1998 Contract"). (Paul Aff. ¶¶ 17, 20; Kamp Aff. ¶¶ 5-6.) ████████████████████████████████████████████████ (Paul Aff. ¶ 19.)

On or about November 10, 2000, NEBCO, CFI, and Oxford executed a "First Amendment to Blueberry Purchase Agreement dated May 22, 1998" (the "2000 Amendment"). (*Id.* ¶¶ 21-22.) That same day the parties also executed an "Amended and Restated Blueberry Purchase Agreement incorporating First Amendment dated November 10, 2000" (the "2000 Contract"). (Paul Aff. ¶ 23; Kamp Aff. ¶ 18.) The 2000 Contract extended ████████████ ████████████████████████████ (Paul Aff. Ex C.) The 2000 Contract also ████████ ████████████████████████████████████████████ (*Id.* Ex C ¶ 1.)

In 2012, NEBCO was reorganized by the Passamaquoddy Tribe as PWBC. (*Id.* ¶ 12.) On April 30, 2012, the Passamaquoddy Tribe assigned all of NEBCO's rights and obligations in the 2000 Contract to PWBC. (*Id.* ¶ 26.) NEBCO, PWBC, CFI, and Oxford executed an "Acknowledgement of Assignment and Consent to be Bound." (*Id.*)

Recently, trends in the blueberry market have changed to the point that the worldwide supply of frozen blueberries has exceeded worldwide demand. (Paul Aff. ¶¶ 39, 43; Kamp Aff. ¶ 21.) By letter dated September 28, 2016, Defendants notified PWBC that CFI "did not wish to further extend the agreement (not add additional years to the agreement)." (Paul Aff. ¶ 44;

2

Kamp Aff. ¶ 25.) However, PWBC believed that, pursuant to the terms of 2000 Contract, the ███████████████████████████████ and Defendants remained bound under the 2000 Contract ███████████████████████████████████ (Paul Aff. ¶¶ 37-38, 48.)

By letter dated February 10, 2017, CFI's counsel notified PWBC that it viewed the 2000 Contract ███████████████████████████ in its entirety and that their agreement was "now over." (Paul Aff. ¶ 53; Kamp Aff. ¶ 36.) By letter dated March 15, 2017, CFI's counsel



(Paul Aff. ¶ 56; Kamp Aff. ¶ 39.)

PWBC filed a five-count complaint against CFI and Oxford on April 11, 2017, asserting claims for breach of contract (Count I), specific performance (Count II), declaratory judgment (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). On May 10, 2017, PWBC filed a motion for attachment and trustee process and a motion for a temporary restraining order and preliminary injunction order requiring Defendants to purchase PWBC's wild blueberry crop with supporting affidavits and exhibits. The following day, May 11, 2017, Defendants filed a motion to dismiss the complaint for failure to state a claim. Defendants filed their oppositions to PWBC's motions with supporting affidavits and exhibits on May 31, 2017. PWBC filed its opposition to the motion to dismiss on June 1, 2017. Each party timely replied to the respective motions. Oral argument on all pending motions was held on June 9, 2017.

## II. DEFENDANTS' MOTION TO DISMISS

The court first addresses Defendants' motion to dismiss for failure to state a claim. Defendants contend that PWBC's complaint fails to state a claim for the following reasons: (1)

3

PWBC's complaint fails to state a claim for breach of contract in light of the plain language of the 2000 Contract the between the parties; (2) as a matter of law, PWBC is not entitled to the remedy of specific performance for any alleged breach; (3) PWBC's claim for declaratory judgment is superfluous and inappropriate; and (4) PWBC's claims for intentional and negligent misrepresentation fail to state a claim because PWBC has failed to allege detrimental reliance, failed to allege fraud with particularity, and because PWBC cannot as a matter of law recover tort damages for what is at its essence a breach of contract claim. (Defs. Mot. Dismiss 4-13; Defs. Reply to Mot. Dismiss 7.) In its opposition, PWBC states that, if the court is inclined to consider the affidavits and additional documents that have been made a part of the record regarding the motions for attachment and preliminary injunction, the court may convert Defendants' motion to one for summary judgment. (Pl. Opp'n Mot. Dismiss 5-6.)

A.     Standard of Review

A motion to dismiss pursuant to Maine Rule of Civil Procedure 12(b)(6) for failure to state a claim tests the legal sufficiency of a complaint. *State v. Weinschenk*, 2005 ME 28, ¶ 10, 868 A.2d 200. The sufficiency of a complaint is a question of law. *Bean v. Cummings*, 2008 ME 18, ¶ 7, 939 A.2d 676. On a motion to dismiss for failure to state a claim, the facts are not adjudicated. *Marshall v. Town of Dexter*, 2015 ME 135, ¶ 2, 125 A.3d 1141. The court reviews the complaint in the light most favorable to the plaintiff to determine whether the complaint sets forth sufficient allegations that would entitle the plaintiff to relief pursuant to some legal theory. *Bean*, 2008 ME 18, ¶ 7, 939 A.2d 676. Dismissal is warranted when it appears beyond a doubt that the claimant is not entitled to relief under any set of facts that the claimant might prove in support of his or her claim. *Id.*

4

Normally on a motion to dismiss for failure to state a claim, only the allegations in the complaint are considered by the court. *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶ 8, 843 A.2d 43. If the court considers material outside of the pleading, the court typically must convert the motion into one for summary judgment under Rule 56. M.R. Civ. P. 12(b). However, in limited circumstances, the court may consider certain extraneous documents without converting a motion to dismiss to one for a summary judgment. *Moody*, 2004 ME 20, ¶ 9, 843 A.2d 43. The court may consider "official public documents, documents that are central to the plaintiff's claims, and documents referred to in the complaint, without converting a motion to dismiss into a motion for a summary judgment when the authenticity of such documents is not challenged." *Id.* ¶ 10.

B. Converting the Motion to Dismiss to one for Summary Judgment

The court declines to convert Defendants' motion to dismiss to a motion for summary judgment. However, the court shall consider the 2000 Contract in deciding the motion to dismiss. Both parties have made the 2000 Contract a part of the record in this case. (*See* Paul Aff. Ex. C; Kamp Aff. Ex. C.) The 2000 Contract is repeatedly referred to in the complaint. (*See e.g.,* Compl. ¶¶ 23-34, 36, 38-41, 51-57.) Moreover, the 2000 Contract is essential to PWBC's claims for breach for contract, specific performance, and declaratory judgment. (*See Id.* ¶¶ 59-79.) The 2000 Contract is also central to PWBC's claims for intentional and negligent misrepresentation. (*See Id.* ¶¶ 81, 85-86, 91, 95.) Therefore, under *Moody*, the court may consider the 2000 Contract contained in the record without converting the motion to one for summary judgment.

C. Breach of Contract

5

To sustain a claim for a breach of contract, a plaintiff must establish: (1) the parties had a legally binding contract; (2) the defendant breached a material term of the contract; and (3) defendant's breach caused the plaintiff to suffer damages. *Tobin v. Barter*, 2014 ME 51, ¶¶ 9-10, 89 A.3d 1088. There is no dispute that the parties entered into a legally binding contract. (Defs. Mot. Dismiss 1-2; Pl. Opp'n Mot. Dismiss 1-2.)

Defendants contend that PWBC has failed to establish a breach because, pursuant to the plain language of the 2000 Contract, the parties' agreement was ██████████████████ ████ (Defs. Mot. Dismiss. 5-6.) Defendants assert that, according to that plain language of the 2000 Contract, ████████████████████████████████ (*Id.* at 5.) Thereafter, ██ ████████████████████████████████ (*Id.*) Defendants assert that, in order to terminate the contract ████████ either party must ██████████████ ████████████████████████████████████ ████████████████ (*Id.* at 5-6.) Thus, according to Defendants, CFI's September 28, 2016 notice ██████████████████████ in accordance with the plain terms of the 2000 Contract. (*Id.* at 6.)

PWBC contends that Defendants' interpretation of the 2000 Contract ignores the plain and unambiguous terms of the contract. (Pl. Opp'n Mot. Dismiss 8.) PWBC argues that, pursuant to the plain language of the 2000 Contract, the parties' agreement ██████████ ██████████ (*Id.* at 7.) ████████████████████████ ████████████████████████████████ ████████ (*Id.* at 7-8.) Thus, according to PWBC, the plain language of the 2000 Contract provided that there would ████████████████████████████████

6

██████████████████████████.[2] (*Id.* at 7.) Thus, according to PWBC, CFI's September 2016 notice

████████████████████████

The interpretation of an unambiguous contract is a question of law for the court. *Town of Lisbon v. Thayer Corp.*, 675 A.2d 514, 516 (Me. 1996). If a contract is unambiguous, the court must give its terms their plain, ordinary, and generally accepted meaning. *Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457. Contract language is ambiguous only "when it is reasonably susceptible to different interpretations." *Thayer Corp.*, 675 A.2d at 516 (internal quotation omitted). When interpreting a written contract, the court must consider the entire agreement. *Estate of* Barrows, 2006 ME 143, ¶ 13, 913 A.2d 608. The court must give effect to the intention of the parties as reflected in the written agreement and construe its terms in light of the subject matter, motive, purpose, and object of the agreement. *Id.* The court must give full force and effect to all contract terms and avoid any interpretation that renders particular terms meaningless. *Id.* The court considers extrinsic evidence of the parties' intent only if the contract is found to be ambiguous. *Garrity*, 2000 ME 48, ¶ 10, 748 A.2d 457.

Paragraph 1 of the 2000 Contract provides:



---

[2] Hereafter, referred to by the court as the ████████████

(Affs. Ex. C ¶ 1) (italics in original). Paragraph 25(a) of the 2000 Contract further provides, in relevant part:

████████████████████████████████████████
████████████████████████████████

(*Id.* ¶ 25(a).)  The 2000 Contract also contains ████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████ (*Id.* ¶

20.)

The court finds the relevant language of the 2000 Contract to be unambiguous.

Paragraph 1 of the 2000 Contract plainly provides for ████████████████████

███████████████████ Paragraph 1 unambiguously states that ███████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ (Affs. Ex. C. ¶ 1) (emphasis supplied).  Pursuant to this plain language, beginning in

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████ In order to terminate the automatic extension, either party must

provide ████████████████████████████████████████████████████

████████████████████ (*Id.*)  When CFI provided its September 28, 2016 notice, ██████████

██████████████████████████████ CFI's September 28, 2016 notice ████████████

████████████████████

Defendants' interpretation of the 2000 Contract ignores the ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ If the parties had only intended for the contract ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ language is completely meaningless and unnecessary. As discussed above, the court must avoid any interpretation that renders particular terms meaningless and must give full force and effect to all contract terms. *Barrows*, 2006 ME 143, ¶ 13, 913 A.2d 608. Moreover, the court finds no conflict between ¶ 1 and ¶ 25(a). The relevant language of ¶ 25(a) simply reiterates the term of the contract set forth in greater detail in ¶ 1. Paragraph 25(a) states that the ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Paragraph 1 states in greater detail that the contract ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Nothing in the plain language of ¶ 25(a) ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Therefore, the plain language of the 2000 Contract ▮▮▮▮▮▮▮ ▮▮▮▮▮▮

In its complaint, PWBC contends that, by letter dated September 28, 2016, Defendants notified PWBC that CFI did not wish to further extend the agreement. (Compl. ¶ 45.) PWBC further contends that, by letter dated February 10, 2017, CFI's counsel notified PWBC that it was taking the position that the 2000 Contract had been terminated as of September 28, 2016, and that the parties' agreement was "now over." (*Id.* ¶ 52.) By letter dated March 15, 2017, CFI's counsel confirmed its position that the 2000 contract has been terminated. (*Id.* ¶ 56.) PWBC contends that CFI has failed to make any payments in 2017 in accordance with the 2000 Contract. (*Id.* ¶¶ 57, 62.) Therefore, based on the plain language of the 2000 Contract and

9

allegations in the complaint, PWBC has sufficiently stated a claim for breach of the 2000 Contract.

D.    Specific Performance

Defendants argue that, even if PWBC has stated a claim for breach of contract, the court should dismiss Count II of the complaint because PWBC is not entitled to the remedy of specific performance as a matter of law. (Defs. Mot. Dismiss 6.) Defendants contend that PWBC is not entitled to specific performance because PWBC has an adequate remedy at law and specific performance is not available to a seller of goods under the Uniform Commercial Code. (*Id.* at 6-7.) In response, PWBC argues that our Law Court has not decided whether the UCC affirmatively precludes a seller from seeking specific performance and that it has alleged sufficient facts to seek specific performance as an alternative to damages. (Pl. Opp'n Mot. Dismiss 9.)

Specific performance is an equitable substitute for damages when the legal remedy is "inadequate or impracticable." *Ludington v. LaFreniere*, 1998 ME 17, ¶ 7, 704 A.2d 875. Specific performance will not be granted where there is an adequate remedy at law. *McIntyre v. Plummer Assocs.*, 375 A.2d 1083, 1084 (Me. 1977). In determining whether damages are adequate, the court may consider: (a) the difficulty of proving damages to a reasonable certainty; (b) the difficulty of procuring a suitable substitute by means of money awarded as damages; and (c) the likelihood that damages cannot be collected. Restatement (Second) of Contracts § 360 (1981). Damages are inadequate where the loss caused by the breach cannot be proved to a reasonable certainty, where the party's interest is incapable of being valued in money, where the goods are so unique there is no available equivalent, or where the replacement goods may be

10

obtainable but only at enormous expense or inconvenience. Restatement (Second) of Contracts § 360 cmt. b; Horton & McGehee, *Maine Civil Remedies* § 6-5(c)(1) at 162 (4th ed. 2004).

The Uniform Commercial Code ("UCC") enumerates the remedies available to a seller of goods. 11 M.R.S.A. § 2-703 U.C.C. cmt. 1 ("This section is an index section which gathers together in one convenient place all of the various remedies open to seller for any breach by a buyer.") Section 2-703 of the UCC provides, where a buyer fails to make payment when due or repudiates a contract for any goods, the seller may (1) withhold delivery of goods, (2) stop delivery by a bailee, (3) proceed under § 2-704 respecting goods still unidentified to the contract, (4) resell the goods and recover damages, (5) recover damages for non-acceptance or the contract price, or (6) cancel the sale of goods. 11 M.R.S. § 2-703. Nowhere in the UCC is specific performance enumerated as a remedy for a seller. *Id.* §§ 2-703-710. However, specific performance is expressly permitted as a remedy for a buyer in the event of a seller's breach. *Id.* § 2-711(2)(b). Section 2-716 of the UCC expressly states, "Specific performance may be decreed where the goods are unique or in other proper circumstances[.]" *Id.* § 2-716(1). *See also* Horton & McGehee, *Maine Civil Remedies* § 6-5(c)(1) at 162 (discussing only a purchasers' right to obtain specific performance for breach of a contract for the sale of goods).

Although our Law Court has not decided the issue, the court concludes that specific performance is generally not available to a seller under the UCC. A judgment for specific performance in favor of a seller would simply order the buyer to pay the contract price for the goods. Thus, a judgment for specific performance in favor of a seller would be indistinguishable from an action for the price under the UCC. *See* 67A Am. Jur. 2d *Sales* § 989 ("An action for the price is tantamount to an action for specific performance."); 1 White, Summers, & Hillman, *Uniform Commercial Code* § 8:2 n.2 (6th ed.) ("The action for the price is, of course, the

11

analogue to the buyer's action for specific performance."); 11 M.R.S.A. § 2-716 U.C.C. cmt. 4 (stating that the buyer's right to specific performance under the UCC "is intended to give the buyer rights to the goods comparable to the seller's rights to the price of the contract"). The UCC expressly permits a seller to recover damages from a buyer who repudiates a contract. 11 M.R.S. §§ 2-708-2-709; 67A Am. Jur. 2d *Sales* §§ 955, 989.

At least one court has found that a seller is not precluded by the UCC from seeking specific performance of a contract. 1 White, Summers, & Hillman, *Uniform Commercial Code* § 8:2 n.2. In *Central Illinois Public Service Company v. Consolidated Coal Company*, a coal supplier entered into a contract with a power company to supply the power with its entire fuel requirement for a new power station. 527 F. Supp. 58, 60 (C.D. Ill. 1981). The contract required the supplier to design and construct its coal mine in such a way that coal was transportable only to the new power station. *Id.* Moreover, the mine was designed and constructed to produce raw coal and the power station was expressly designed to receive only raw coal, effectively precluding the supplier from ever selling its goods to any other buyers. *Id.* Because of the exclusive design of both the mine and power station, the parties entered to an agreement with a fixed thirty-year term after initial operation, with a right to terminate after fifteen years from initial operation if performance became uneconomical or impractical, but only upon five-years' written notice. *Id.* at 61. The court held that, because the case involved a long-term contract with significant capital investment, damages would be difficult to calculate. *Id.* at 61, 67. Thus, under the "unusual circumstances" of the case, the court found that any legal remedy was likely inadequate and the seller was likely entitled to specific performance. *Id.*

Here, the 2000 Contract bears some similarity to the contract in *Central Illinois* in that it is ███████████████████████████████ However, unlike *Central Illinois*, PWBC's

12

allegations do not demonstrate that it has no adequate remedy at law. In its complaint, PWBC asserts that CFI ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Compl. ¶ 32.) CFI is obligated to ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as those terms are defined in the 2000 Contract. (*Id.* ¶ 33; Affs. Exs. C ¶ 10.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* ¶ 34.) PWBC further asserts that for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* ¶ 35.) The 2000 Contract also ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ (*Id.* ¶ 38; Affs. Exs. C ¶ 12.) As discussed above, the UCC expressly permits a seller to recover damages from a buyer who repudiates a contract. *See* 11 M.R.S. §§ 2-709-2-709. Based on the terms of 2000 Contract and the allegations set forth in the complaint, PWBC's damages are likely calculable to a reasonable certainty. Thus, PWBC has an adequate remedy at law. Accordingly, PWBC's claim for specific performance must be dismissed.

E. Declaratory Judgment

Defendants also argue that PWBC's claim for a declaratory judgment interpreting the terms of the 2000 Contract should be dismissed because it is superfluous and duplicative of its claim for breach of contract. (Defs. Mot. Dismiss 8-9.) Pursuant to Maine's Declaratory Judgment Act, any party may obtain a declaration regarding the validity or construction of a contract, and their rights, status, or other relations thereunder, before or after a breach thereof. 14 M.R.S. §§ 5954-55. "The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." M.R. Civ. P. 57. The

13

Declaratory Judgment Act complements other relief available under applicable law. 22A Am. Jur. 2d *Declaratory Judgments* § 45. It is an alternative or additional remedy to facilitate the administration of justice and to fix and determine rights. *Id.* An action for declaratory judgment "should not be refused merely because another remedy is available." *Id.* § 47. However, the court in its discretion may deny declaratory relief when more appropriate or effective relief exists and declaratory judgment serves no useful purpose. *Id.*; *see also* Horton & McGehee, *Maine Civil Remedies* § 3-1(d) at 36 ("The existence of another remedy can limit the availability of a declaratory judgment chiefly when the remedy is statutorily provided and applies specifically to the controversy for which relief is sought.").

Here, the court sees no reason to deny declaratory relief to PWBC at this stage in the proceeding. Although the UCC statutorily provides remedies to PWBC on its breach of contract claim, nothing in the UCC precludes declaratory judgment or makes its remedies the exclusive remedies available to PWBC. *See* 11 M.R.S. §§ 2-703. To the contrary, the UCC expressly provides, "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity... supplement its provisions." *Id.* § 1-1103(2). Therefore, PWBC is not precluded from seeking a declaratory judgment interpreting the terms of the 2000 Contract simply because it has also brought a claim for breach of contract.

F.    Intentional and Negligent Misrepresentation

Lastly, Defendants argue that PWBC's claims for intentional and negligent misrepresentation must be dismissed because PWBC cannot demonstrate justifiable reliance or that any misrepresentations by CFI were material and has failed to plead intentional misrepresentation with sufficient particularity. (Defs. Mot. Dismiss 11-13.) In their reply,

14

Defendants further assert that PWBC cannot recover tort damages for what is at its essence a breach of contract claim. (Defs. Reply to Mot. Dismiss 7.)

Foremost, while the law of torts and the law of contracts are both predicated on the relationship between parties and the duties owed to one another, the relationships and duties involved are fundamentally different. *See Adams v. Buffalo Forge Co.*, 443 A.2d 932, 938 (Me. 1982). While nearly every breach of contract involves conduct that could be considered tortious, "if tort law and contract law are to fulfill their distinctive purposes, they must be distinguished where it is possible to do so." *Pendleton Yacht Yard, Inc. v. Thomas*, 2003 Me. Super. LEXIS 49, at *8 (Mar. 20, 2003) (internal quotation and citation omitted). Thus, "a mere breach of contract is not actionable as a tort." *Id.*; *see also* Horton & McGehee, *Maine Civil Remedies* § 15-2(b)(2) at 306. However, "circumstances surrounding the contract may give rise to an independent duty to exercise due care or similar duty in tort, in which case a breach may be actionable under both tort and contract theory." *Id.* (internal quotation and citation omitted); *see also* Horton & McGehee, *Maine Civil Remedies* § 15-2(b)(2) at 306-07.

To sustain a claim for intentional misrepresentation, a plaintiff must prove by clear and convincing evidence that (1) the defendant a made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of its truth or falsity; (4) for the purpose of inducing the plaintiff to act in reliance upon it; and (5) the plaintiff justifiably relied upon the fact as true to their detriment. *Me. Eye Care Assocs., P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707. Pursuant to Maine Rule of Civil Procedure 9(b), averments of or circumstances constituting fraud must be pled "with particularity" in order to fairly apprise the defendant of the claim. *Stevens v. Bouchard*, 532 A.2d 1028, 1030 (Me. 1987).

15

Similarly, to sustain a claim for negligent misrepresentation, a plaintiff must prove that (1) in the course of a business, profession, employment or any other transaction in which the defendant has a pecuniary interest; (2) the defendant supplied false information; (3) for the guidance of others in the business transactions; (4) and the defendant failed to exercise reasonable care or competence in obtaining or communicating the information; (5) causing the plaintiff to justifiably rely upon the information as true to the plaintiff's detriment. *St. Louis v. Wilkinson Law Offices, P.C.*, 2012 ME 116, ¶ 18, 55 A.3d 443.

PWBC's complaint contains the following allegations: as of October 2015, pursuant to terms of the 2000 Contract, ███████████████████████████████████████ by letter dated September 28, 2016, Defendants notified PWBC that it did not wish to further extend the agreement for additional years; PWBC acknowledged the letter at its September 29, 2016 board meeting, at which a representative of Defendants was present; At the September 29, 2016 board meeting, Defendants' representative informed PWBC that CFI ████████████████ ████████████████████████████████████████████████████████████████ ██████████ Defendants' representative also acknowledged during the September 29, 2016 board meeting that CFI was obligated, and in fact intended, ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████ and specifically during a conference call with Ragnar Kamp on January 9, 2017, CFI's employees and agents continued to represent to PWBC employees that CFI was bound by the 2000 Contract ███████████████████████ in reliance on those conversations, PWBC made plans for the 2017 growing season and did not seek an alternative buyer for its blueberries; by letter dated February 10, 2017, CFI notified PWBC that it was taking the position that the 2000 Contract had been terminated by the September 28, 2016 notice and the contract

16

was now over; CFI confirmed its position that the 2000 Contract has concluded in its March 15, 2017 letter. (Compl. ¶¶ 41, 45-52, 56.)

PWBC's complaint further contends that Defendants knowingly misrepresented or failed to disclose its intention not to perform the 2000 Contract beyond September 2016. (*Id.* ¶¶ 81-84.) PWBC contends that Defendants misrepresentations and omissions were made to prevent PWBC from seeking an alternative buyer for its 2017 harvest and to induce PWBC to renegotiate the terms of the 2000 Contract. (*Id.* ¶¶ 86-89.) PWBC also avers that Defendants failed to exercise reasonable care and competence in making their representations. (*Id.* ¶ 97.) PWBC contends that it has relied on Defendants misrepresentation and omissions to its detriment. (*Id.* ¶¶ 92-93, 98-99.)

Viewing the allegations in the light most favorable to PWBC, the court finds that PWBC has set forth sufficient facts that may give rise to an independent duty outside of the 2000 Contract, specifically the allegations that Defendants misrepresentations and omissions were made to prevent PWBC from seeking an alternative buyer for its 2017 harvest and to induce PWBC to renegotiate the terms of the 2000 Contract. (*Id.* ¶¶ 86-89.) Moreover, based on the above allegations, the court finds that PWBC's complaint states sufficient facts with particularity to state claims for intentional and negligent misrepresentation. Therefore, the court declines to dismiss PWBC's tort claims at this stage in the proceeding.

Therefore, based on the foregoing, Defendants' motion to dismiss PWBC's complaint shall granted as to Count II for specific performance and denied as to all other counts.

### III. PWBC'S MOTION FOR ATTACHMENT AND TRUSTEE PROCESS

#### A. Standard of Review

17

Pursuant to Maine Rules of Civil Procedure 4A and 4B, the court shall grant an order approving attachment and trustee process only upon a finding that "it is more likely than not" that the plaintiff will recover a judgment, including interest and costs, greater than or equal to the aggregate sum of the attachment and trustee process plus any liability insurance, bond, other security, or other attached property available to satisfy the judgment. M.R. Civ. P. 4A(c); 4B(c). Thus, the plaintiff must prove, by a preponderance of the evidence, it will succeed on its claim and recover an amount equal to or greater than the amount of the attachment sought. *Trans Coastal Corp. v. Curtis*, 622 A.2d 1186, 1188 (Me. 1993). The motion for attachment and trustee process must be supported by affidavits setting forth "specific facts sufficient to warrant the required findings." M.R. Civ. P. 4A(c), (i); 4B(c).

B.  Success on the Merits

PWBC contends it is more likely than not that it will succeed on its breach of contract claim against Defendants.[3] (Pl. Mot. Attach. 3.) As previously discussed, to recover on a claim for a breach of contract, a plaintiff must prove: (1) the parties had a legally binding contract; (2) the defendant breached a material term of the contract; and (3) defendant's breach caused the plaintiff to suffer damages. *Tobin*, 2014 ME 51, ¶¶ 9-10, 89 A.3d 1088. The interpretation of an unambiguous contract is a question of law for the court. *Thayer Corp.*, 675 A.2d at 516. The court gives terms in an unambiguous contract their plain and ordinary meaning. *Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457.

---

[3] PWBC contends it is also likely to succeed on its claims for intentional and negligent infliction of emotional distress. (Pl. Mot. Attach. 3.) However, PWBC's damages calculations are based solely upon the remedies available on its breach of contract claim under the UCC. (*Id.* 4.) PWBC has provided no evidence regarding its damages on its tort claims. (*Id.*) Therefore, PWBC cannot demonstrate that it is more likely than not that it will recover damages in an amount equal to or greater than the amount of the attachment sought on its tort claims.

18

As discussed above, Paragraph 1 of the 2000 Contract plainly provides that, ███████████████ ████████████████████████████████████████████████ ███████████████████████████ (Affs. Ex. C.) In order to terminate the automatic extension, ████████████████████████████████████████████████████████ ██████████████████████████ (*Id.*) Thus, the 2000 Contract unambiguously contains a ███████████████████████████████████████ (*Id.*)

In support of its motions, PWBC has provided an affidavit from its Manager, Darren Paul. (Paul Aff. ¶ 3.) According to the affidavit, by letter dated September 28, 2016, Defendants notified PWBC that CFI ████████████████████████████████████████████ ███████████████████ (*Id.* ¶ 44, Pl. Ex. F.) By letter from CFI's counsel dated February 10, 2017, CFI notified PWBC that it viewed the 2000 Contract as terminated as of September 28, 2016 in its entirety and that the agreement was "now over." (*Id.* ¶ 53, Pl. Ex. G.) CFI's counsel then sent another letter dated March 15, 2017, confirming its position that the 2000 Contract had concluded. (*Id.* ¶ 56, Pl. Ex. H.) PWBC ██████████████████████████████ ██████ as required by the 2000 Contract. (*Id.* ¶¶ 31, 35-36; Affs. Ex C ¶ 11(a).)

These assertions are largely undisputed by Defendants. Defendants have submitted an affidavit from Ragnar Kamp, the Chief Operating Officer of Oxford and President of CFI. (Kamp. Aff. ¶ 2.) Kamp acknowledges that, by letter dated September 28, 2016, CFI notified PWBC of its intent to terminate the 2000 Contract. (*Id.* ¶¶ 25-26, Defs. Ex. D.) Kamp further acknowledges that CFI's counsel sent letters to PWBC dated February 10, 2017, and March 15, 2017, confirming its position that the 2000 Contract had ended. (*Id.* ¶¶ 36, 39, Defs. Exs. F-G.)

Based on the foregoing, it appears there is no dispute that CFI repudiated the 2000 Contract and considered ██████████████████████████ This is plainly contrary to the

19

unambiguous terms of the 2000 Contract, which provided ████████████████████████████
████████████████████████ Therefore, PWBC has sufficiently demonstrated that it is more likely than not that PWBC will succeed on the merits of its breach of contract claim.

C.     Amount of Judgment

In order to demonstrate that it is more likely than not that it will recover an amount equal to or greater than the amount of the attachment sought, a plaintiff must "make a sufficiently specific showing by providing evidence from which an 'informed projection' can be made as to the amount of damages." *Wilson v. DelPapa*, 634 A.2d 1252, 1255 (Me. 1993) (citation omitted). PWBC contends that it is entitled to the price of PWBC's blueberry harvest for ██ ████████████████████████████████████ under §2-709(1)(b) of the UCC. (Pl. Mot. Attach. 4.) PWBC contends that an informed projection of the price for ██████████████████████████ ██████████████████████ (*Id.*) Alternatively, if the court determines that PWBC is not entitled to the price of the contract under § 2-709, PWBC contends that it is entitled to damages based on the contract-market differential under § 2-708(1) and that an informed projection of its damages is ██████████████ (*Id.* at 5-6.) PWBC further contends that, if the court were to rely on a market price that failed to put as good a position as if the contract had been performed, PWBC is entitled to ██████████████ in anticipated profits under § 2-708(2). (*Id.* at 6 n.4.)

In opposition, Defendants contend that PWBC is not entitled to recover the price of the 2000 Contract under § 2-709(1)(b) because PWBC has not demonstrated that it made reasonable efforts to resell the goods at a reasonable price or that circumstances indicate such efforts would be unavailing. (Defs. Opp'n Mot. Attach. 5.) Defendants contend that, if PWBC is entitled to any remedy, PWBC is only entitled to the contract-market differential under § 2-708(1). (*Id.* at 6.) Defendants further contend that, in arriving at its projections, PWBC erroneously uses a six-

20

year average to calculate its contract price and its costs. (*Id.* at 6-8.) Defendants assert that PWBC's blueberry yield, the price per pound under the 2000 Contract, and its costs for 2016 are the best estimates PWBC's damages for ▨▨▨▨▨ (*Id.* at 7.) Defendants assert that an informed projection of PWBC's damages under § 2-708(1) amounts to only ▨▨▨▨ (*Id.* at 8.)

Under the UCC, a seller is generally not entitled to the recover the price of goods not accepted by the buyer because the seller is usually in a position to resell the goods. 1 White, Summers, & Hillman, *Uniform Commercial Code* § 8:2. However, the UCC recognizes an exception to this general rule when a seller is unable to resell goods. *Id.* Section 2-709 of the UCC provides in relevant part:

> (1) When the buyer fails to pay the price as it becomes due, the seller may recover, together with any incidental damages under section 2-710,[4] the price
>
> ...
>
> (b) Of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.
>
> (2) Where the seller sues for the price, he must hold for the buyer any goods which have been identified to the contract and are still in his control except that if resale become possible he may resell them at any time prior to the collection of the judgment. The net proceeds of any such resale must be credited to the buyer and payment of the judgment entitles him to any goods not resold.
>
> (3) After the buyer ... has repudiated..., a seller who is held not entitled to the price under this section shall nevertheless be awarded damages for nonacceptance under section 2-708.

11 M.R.S. § 2-709. Thus, § 2-709(1)(b) permits a seller to recover the price if, after reasonable effort, the seller is unable to resell the goods at a reasonable price, or where the circumstances reasonably indicate that such effort will be unavailing. 1 White, Summers, & Hillman, *Uniform*

---

[4] For the purposes of attachment and trustee process, PWC is not seeking incidental damages under § 2-710. (Pl. Mot. Attach. 4 n.3.)

21

*Commercial Code* § 8:2. The buyer is entitled to the goods upon payment of any judgment under § 2-709. *Id.*

Contrary to Defendants' argument, PWBC has sufficiently established that it is more likely than not that PWBC is unable, after reasonable efforts, to sell its blueberry crop at a reasonable price. In his affidavit, Darren Paul states that, for the past six years, PWBC has sold approximately ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Paul Aff. ¶ 30.) Paul states that, since March 15, 2017, he has personally contacted four other blueberry processors in Maine about purchasing PWBC's 2017 crop. (Paul Aff. ¶ 58.) According to Paul, none of the processors wished to purchase blueberries at that time. (*Id.*) Attached to Paul's affidavit are emails from the four processors. (Paul Aff. Exs. I-1-I-4.) Of the four processors, only one expressed at least some interest in purchasing some blueberries from PWBC. (Paul Aff. Ex. I-4.) The one processor stated, "As you can imagine, at the moment we are not looking for more supply of conventional fresh blueberries. We could handle a bit more, say 500,000 pounds, but it is very difficult to sell them frozen under the current market conditions." (*Id.*) The processor expressed interest in purchasing more certified organic fresh blueberries if PWBC's blueberries were certified, and stated that there may be potential for it to buy additional fresh blueberries from PWBC in future years, but not until after 2017. (*Id.*) Paul further states that the market for blueberries has changed, resulting a situation where worldwide supply will likely continue to exceed worldwide demand for 2017 and 2018. (Paul Aff. ¶¶ 39, 43.) In his affidavit in support of Defendants' opposition, Kamp acknowledges that there continues to be an oversupply of wild blueberries in the market compared to worldwide demand. (Kamp Aff. ¶ 21.)

PWBC is not required to prove that there is absolutely no market for its blueberries, only that it is "unable after reasonable effort to resell them at a reasonable price or the circumstances

22

reasonably indicate that such effort will be unavailing." *See Great W. Sugar Co. v. Pennant Prods., Inc.*, 748 P.2d 1359, 1361 (Colo. App. 1987) (upholding trial courts determination that reasonable efforts resell sugar would have been unavailing because the market price for refined beet sugar declined drastically after the parties entered into their contracts and the entire sugar industry consistently had more sugar to sell than the market could absorb); *Foxco Indus., Ltd. v. Fabric World, Inc.*, 595 F.2d 976, 984 (5th Cir. 1979) (upholding jury's determination that the plaintiff was entitled to recover the price under § 2-709 despite the presence of some market for the goods, because the jury was only required to find that plaintiff used reasonable efforts and there was no reasonable price). Therefore, based on the foregoing, PWBC has sufficiently demonstrated that it is has made reasonable efforts to resell it blueberry crop, that it is unable to resell its blueberry crop at a reasonable price, and that such efforts will be unavailing. Thus, PWBC has sufficiently demonstrated it is more likely than not that it is entitled to recover the price of its blueberries under § 2-709 of the UCC.[5]

As discussed above, PWBC asserts that an informed projection of the price for the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (Pl. Mot. Attach. 4.) In support of its projection, PWBC has submitted an affidavit by its Bookkeeper, Grace Falzarano. (Falzarano Aff. ¶ 3.) Falzarano avers that she arrived at the ▉▉▉▉▉▉▉ projection by reviewing PWBC's financial records from 2011 through 2016. (*Id.* ¶ 9.) During those six years, PWBC's average annual gross revenue from its sales to CFI was ▉▉▉▉▉▉▉ (*Id.* ¶ 11.) Falzarano contends that the historical average of the amounts paid to PWBC by CFI are a reasonable projection of the amounts that will be paid under ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (*Id.*

---

[5] As discussed above, CFI would still be entitled to receive PWBC's blueberry crop upon payment of any judgment under § 2-709. 11 M.R.S. § 2-709(2); 1 White, Summers, & Hillman, *Uniform Commercial Code* § 8:2. CFI is also entitled to receive credit for the net proceeds of any resale by PWBC prior to collecting any judgment. 11 M.R.S. § 2-709(2).

23

¶ 10.) Thus, Falzarano contends that ███████████████████████████████████████ ███████████████████████████████████████ (*Id.* ¶ 11.) Paul also avers that PWBC is not aware of any insurance, bond, credit or other security available to satisfy a judgment against CFI or Oxford. (Paul Aff. ¶¶ 64-65.)

In opposition, Kamp contends using a six-year average is not an accurate measure of PWBC's damages. (Kamp Aff. ¶ 47.) Kamp avers that, in his experience as an employee of CFI since 1991, blueberry yields are driven by weather, pollination conditions, growing conditions, and other factors. (*Id.* ¶¶ 4, 48.) Thus, according to Kamp, it is impossible to predict conditions for the ████████████ by simply averaging the past yields. (*Id.* ¶ 48.) Kamp further contends that Falzarano's calculations assume that the average price per pound for the last six years, ██████ will be the price per pound for the ████████████ (*Id.* ¶ 49.) Kamp contends that this assumption ignores the conditions of the current blueberry market, which is facing a gross oversupply of blueberries compared to worldwide demand. (*Id.* ¶¶ 49-50.) The market price for blueberries in 2016 was $0.25 per pound. (*Id.* ¶ 50.) Based on the current condition of the blueberry market, and the unprecedented levels of inventory CFI and other packers have on hand, Kamp does not expect the market price for blueberries to exceed $0.25 per pound during the ████████████. (*Id.* ¶ 51.) Thus, according to Kamp, CFI would be required to pay the ███████████████████████████████████████ (*Id.*) Kamp contends that the most accurate way to arrive at an informed projection for the ████████ ████ is to look solely at the previous year's blueberry yield and to multiply PWBC's 2016 yield by the ███████████████████████ to determine PWBC's projected annual gross revenue. (*Id.* ¶ 64.) Kamp asserts that PWBC's projected annual gross revenue would be ████████████ (*Id.*) Thus, according to Kamp calculations, PWBC's projected price for the

24

███████████████████████████████████████████ *(Id.*; Defs.

Opp'n Mot. Attach. 8.)

Although PWBC may be able obtain a larger damages award at trial, at this stage in the proceeding, based on the affidavits submitted, the court finds that it is more likely than not that PWBC will obtain a judgment at least equal to $12,667,320.90. Accordingly, PWBC is entitled to attachment and trustee process in that amount.

## IV. PWBC'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Lastly, PWBC seeks a temporary restraining order and preliminary injunction mandating that Defendants purchase PWBC's wild blueberry crop pursuant to the term of the 2000 Contract. (Pl. Mot. Prelim. Inj. 1.) Where all parties have sufficient notice and opportunity to present evidence and legal arguments, a motion and hearing for a temporary restraining order may be treated as a motion for preliminary injunction. *Clark v. Goodridge*, 632 A.2d 125, 127 (Me. 1993). Defendants in this case had adequate notice, submitted evidence and had a full opportunity to present its legal arguments in opposition to PWBC's motion. Accordingly, this motion shall be treated as a motion solely for preliminary injunction.

### A. Standard of Review

To obtain a preliminary injunction, a plaintiff must produce *prima facie* evidence demonstrating: (1) the plaintiff will suffer "irreparable injury" if the injunction is not granted; (2) the irreparable injury to the plaintiff outweighs any harm to the defendant from granting the injunction; (3) the plaintiff is likely to succeed on the merits of his or her claims; and (4) the public interest will not be adversely affected by granting the injunction. *Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res.*, 2003 ME 140, ¶ 9, 837 A.2d 129. If the plaintiff fails to demonstrate any one of the elements, the motion for preliminary injunction must be denied.

25

*Id.* ¶ 10. In deciding a motion for preliminary injunction, the court may rely on evidence presented in sworn depositions, affidavits, oral testimony, or a verified complaint. 3 Harvey, *Maine Civil Practice* § 65:4 at 333 (3d ed. 2011); *Bangor Historic Track*, 2003 ME 140, ¶ 10, 837 A.2d 129.

Because PWBC's motion seeks an injunction compelling Defendants to take an affirmative action, PWBC's motion is one for mandatory injunctive relief. *See* Horton & McGehee, *Maine Civil Remedies* § 5-2 at 100. To obtain a mandatory preliminary injunction, the plaintiff must meet a higher burden. *Id.* § 5-2 n.14 at 100. The plaintiff must show "a clear likelihood of success on the merits." *Dep't of Envtl. Prot. v. Emerson*, 563 A.2d 762, 771 (Me. 1989).

### B. Irreparable Injury

An "irreparable injury" is an injury for which there is no adequate remedy at law. *Bangor Historic Track*, 2003 ME 140, ¶ 10, 837 A.2d 129 (citation omitted). As discussed above, the court finds it is more likely than not that PWBC will recover damages on its breach of contract claim. Therefore, PWBC has an adequate remedy at law and is not entitled to a mandatory preliminary injunction. Because PWBC has failed to demonstrate an irreparable injury, the court need not consider the other elements for preliminary injunction. Therefore, the Court denies Plaintiff's motion for preliminary injunction.

26

## V. CONCLUSIONS

Defendants Cherryfield Foods, Inc. and Oxford Frozen Foods Limited's motion to dismiss the complaint for failure to state a claim is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion is **GRANTED** as to Count II of the complaint for specific performance and **DENIED** as to all other counts.

Plaintiff Passamaquoddy Wild Blueberry Company's motion for attachment and trustee process is **GRANTED** in the amount of $12,667,320.90.

Plaintiff Passamaquoddy Wild Blueberry Company's motion for a temporary restraining order and preliminary injunction is **DENIED**.

Pursuant to Maine Rule Civil Procedure 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated     c  |20/17

**M. Michaela Murphy**
**Justice, Business and Consumer Court**

Entered on the Docket: 6.21.17
Copies sent via Mail___ Electronically ✓

27

**Passamaquoddy Wild Blueberry Co. v.**
**Cherryfield Foods, Inc. and Oxford Frozen Foods, Ltd**

**BCD-CV-17-18**

### Passamaquoddy Wild Blueberry Co
### Plaintiff

Counsel:                          Julia Petney, Esq.
                                  Timothy Steigelman, Esq.
                                  84 Marginal Way, Suite 600
                                  Portland, ME  04104-2480

### Cherryfield Foods, Inc. and Oxford Frozen Foods, Ltd
### Defendants

Counsel:                          John Aromando,, Esq.
                                  Eric Wycoff, Esq.
                                  Merrills Warf
                                  254 Commercial St
                                  Portland, ME 04101